REVISED, November 12, 1998

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-20645
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ESNORALDO DE JESUS POSADA-RIOS
CARLOS ANTONIO MENA
ELISA GRAJALES MURGA
CARMENZA GUZMAN VARON
RAUL GAMBOA
LUIS GERARDO RIOS-CASTANO
MANUEL DE JESUS PARADA
ANTHONY JEROME GAGE
KELVIN JACKQUET
MONA SMITH WATSON,

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Southern District of Texas
_____

October 21, 1998

TABLE OF CONTENTS

I.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . .  5

      A.  Samuel Posada-Rios Organizes "La Compania" . . . .  5

      B.  Threats from Rival Drug Dealers and
          Retaliation by La Compania . . . . . . . . . . . .  8

      C.  Samuel Posada-Rios Operates La Compania from
          Colombia . . . . . . . . . . . . . . . . . . . . . 11

          1.  Ariel Ochoa and Esnoraldo De Jesus Posada-
              Rios take over the Houston operation . . . . . 11

          2.  Elisa Grajales Murga . . . . . . . . . . . . . 13

D.  Harold and Wonda Cortes . . . . . . . . . . . . . . .  15

    1.  The Harold Cortes Organization (Manuel
        Parada) . . . . . . . . . . . . . . . . . . . . .  16

    2.  The Wonda Cortes Organization . . . . . . . . .  20

        a.  Mona Smith Watson and Tony Jones  . . . . .  20

        b.  Mary Helen Hermann  . . . . . . . . . . . .  21

        c.  Anthony Jerome Gage and Kelvin Jackquet . .  22

        d.  Carmenza Guzman Varon . . . . . . . . . . .  23

        e.  November 15-16, 1991, distributions to Gage,
            Jackquet, Watson, and Varon . . . . . . . .  23

        f.  December 10-11, 1991, distributions to Watson,
            Gage, Jackquet, Carmenza Varon, and Janeth Varon
            . . . . . . . . . . . . . . . . . . . . . .  26

        g.  January 1992 distributions  . . . . . . . .  29

E.  Mona Smith Watson's Cocaine Distributions . . . . .  29

F.  Anthony Gage and Kelvin Jackquet's Cocaine Distri-butions
    . . . . . . . . . . . . . . . . . . . . . . . . . .  31

G.  Raul Gamboa and Carlos Mena . . . . . . . . . . . .  32

H.  The Demise of La Compania . . . . . . . . . . . . .  35

II.  VERDICTS AND SENTENCES . . . . . . . . . . . . . . . .  37

III.  DISCUSSION . . . . . . . . . . . . . . . . . . . . . .  40

A.  Sufficiency of the Evidence Challenges  . . . . . .  40

    1.  RICO, 18 U.S.C. § 1962(c) . . . . . . . . . . .  41

    2.  RICO Conspiracy, 18 U.S.C. § 1962(d) . . . . .  45

        a.  Mena  . . . . . . . . . . . . . . . . . . .  48

        b.  Murga . . . . . . . . . . . . . . . . . . .  50

        c.  Varon . . . . . . . . . . . . . . . . . . .  50

        d.   Parada  . . . . . . . . . . . . . . . . . . . 51

        e.   Gage   . . . . . . . . . . . . . . . . . . . 52

    3.   The Controlled Substances Violations  . . . . . 53

        a.   Mena   . . . . . . . . . . . . . . . . . . . 53

        b.   Murga  . . . . . . . . . . . . . . . . . . . 54

        c.   Gamboa  . . . . . . . . . . . . . . . . . . . 54

        d.   Parada  . . . . . . . . . . . . . . . . . . . 55

        e.   Gage   . . . . . . . . . . . . . . . . . . . 55

    4.   Jackquet's conviction for use of a firearm "during and in relation to" a drug trafficking offense in violation of 18 U.S.C. § 924(c) . . . . . . . . 56

    5.   Murga's conviction for making a false statement on a visa application in violation of 18 U.S.C. § 1546(a) . . . . . . . . . . . . . . . . . . . . . . . . 58

B.   Joinder and Severance Issues  . . . . . . . . . . . 59

    1.   Joinder . . . . . . . . . . . . . . . . . . . . 59

    2.   Severance . . . . . . . . . . . . . . . . . . . 60

C.   Evidentiary Issues  . . . . . . . . . . . . . . . . 66

    1.   Admissibility of Watson's Statements  . . . . . 66

    2.   Admissibility of Murga's Statements . . . . . . 72

    3.   Admissibility of Evidence Seized from the Mercury Sable . . . . . . . . . . . . . . . . . . . . . 72

    4.   Admissibility of Evidence Seized from Jackquet's Residence . . . . . . . . . . . . . . . . . . . 74

    5.   The Government's Trial Charts . . . . . . . . . 75

    6.   The Alleged Hearsay Testimony of Agent Schaefer  . . . . . . . . . . . . . . . . . . . 77

    7.   Impeachment Evidence Against Agent Schaefer . . 79

    8.   Extraneous Offense Evidence Against Gage  . . . 81

    9.   Violation of Fed. R. Evid. 615 by Hall and

Cortes . . . . . . . . . . . . . . . . . . . . 82

    D.   Instructions to the Jury . . . . . . . . . . . . . . . 84

          1.  Voir Dire Instruction About Guilty Pleas . . . 84

          2.  Failure to Submit Duress Instruction . . . . . 86

          3.  Deliberate Ignorance Instruction . . . . . . . 92

    E.   Contact with a Juror . . . . . . . . . . . . . . . 93

    F.   Ineffective Assistance of Counsel . . . . . . . . . 96

    G.  Sentencing Issues . . . . . . . . . . . . . . . . . 98

          1.  Esnoraldo Posada-Rios . . . . . . . . . . . . . 99

          2.  Mena . . . . . . . . . . . . . . . . . . . . . 99

          3.  Murga . . . . . . . . . . . . . . . . . . . . 102

          4.  Varon . . . . . . . . . . . . . . . . . . . . 104

          5.  Gamboa . . . . . . . . . . . . . . . . . . . . 105

          6.  Rios-Castano . . . . . . . . . . . . . . . . . 106

          7.  Gage . . . . . . . . . . . . . . . . . . . . . 107

          8.  Jackquet . . . . . . . . . . . . . . . . . . . 108

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 109

Before KING and STEWART, Circuit Judges, and LAKE,[*] District Judge.

SIM LAKE, District Judge:

In December of 1992 a 134-page superseding indictment was returned charging 35 defendants with drug trafficking and related charges arising out of a conspiracy that began in 1985.  After 84 days of trial, the ten defendants who are parties to this consolidated appeal were convicted of a number of offenses.  Most of the defendants challenge the sufficiency of the evidence to support their convictions, and various defendants challenge a number of the trial court's rulings before and during trial and at sentencing.  Except as to the RICO conspiracy conviction of Carlos Antonio Mena, we **AFFIRM** the judgments of the trial court.

## I.  FACTUAL BACKGROUND

**A.    Samuel Posada-Rios Organizes "La Compania"**

In 1985 Leoncio Ysreal Espaillat[2] met Fabio Ochoa, Jr., a Colombian cocaine supplier, and Samuel Posada-Rios.  From 1986 through 1988 Espaillat stored approximately 12,000 kilograms of Fabio Ochoa's cocaine at Espaillat's ranch in the Dominican Republic.  Some of the cocaine was delivered to Samuel Posada-Rios,

---

[*]District Judge for the Southern District of Texas, sitting by designation.

[2]The downfall of the Samuel Posada-Rios cocaine trafficking enterprise was hastened by the arrest of Espaillat.  After he was convicted of federal drug offenses in 1989 and sentenced to twenty years in prison Espaillat began cooperating with law enforcement agents.  At trial Espaillat detailed the history and organization of the Samuel Posada-Rios drug conspiracy.

who was then operating from Tampa, Florida.  Samuel Posada-Rios and his partner, Carlos Moncada Rendon, formed a cocaine trafficking enterprise known as "La Compania."  Samuel Posada-Rios' inner circle of associates included Miguel Cardona and Luis Gerardo Rios-Castano ("a/k/a Luis Rios"; a/k/a "Flecha")[3] (both of whom operated as transporters and assassins for the organization), Pepo Rendon (Carlos Rendon's brother), Wilson Patino, Mario Restrepo, and Mercedes Agredo.  Samuel Posada-Rios supplied cocaine to a number of major distributors, including Esnoraldo De Jesus Posada-Rios, Jose Aref-Mohammed, Enrique Perez, Jose Hernandez, Harold Cortes, and Wonda Cortes.  Each of the major distributors had his or her own distributor customers.

At Samuel Posada-Rios' direction Espaillat began transporting drugs and money from Los Angeles to New York and Miami in 1986.  On his first trip Espaillat flew to Los Angeles and was driven by Samuel Posada-Rios from the airport to the cocaine stash house.  After hiding the cocaine in a secret compartment in a camper of a small truck, Espaillat drove to Queens, New York, and delivered the cocaine to Esnoraldo De Jesus Posada-Rios.  Shortly thereafter, Samuel Posada-Rios moved his drug trafficking operations from Tampa to Houston.  Samuel Posada-Rios began paying Espaillat $10,000 a month to assist in driving 25- to 200-kilogram loads of cocaine from Houston to Austin, Dallas, New York, and Colorado by renting cars and finding apartments and storage for the cocaine.

---

[3]For ease of understanding the names of the ten appellants are underlined in this abbreviated factual summary.

In early 1987 Espaillat delivered two loads, of 10 and 25 kilograms, to Aref-Mohammed at the instructions of Samuel Posada-Rios. Aref-Mohammed then asked to meet Samuel Posada-Rios, and the two began dealing directly with one another. Espaillat then began making cocaine deliveries at least twice a month to "Chu Chu," an employee of Aref-Mohammed. Henry Alfredo Garcia also transported cocaine from Samuel Posada-Rios to Aref-Mohammed through Chu Chu.

In 1987 most of the cocaine delivered to Samuel Posada-Rios in Houston arrived over land. On September 6, 1987, however, 850 kilograms of cocaine arrived in Houston on a ship from Colombia and was transported to Samuel Posada-Rios' house in the Mission Bend area of Houston. Present at the house to count and distribute the cocaine were Samuel Posada-Rios, Espaillat, Enrique Perez, Mercedes Agredo, Miguel Cardona, Rios-Castano, and Chu Chu. Perez and Aref-Mohammed received 350 kilograms, and the remaining 500 kilograms went to Samuel Posada-Rios. Espaillat delivered $675,000 in cash to the captain of the ship as payment for transporting the cocaine. Espaillat obtained the money from Samuel Posada-Rios, Enrique Perez, and Chu Chu, who was acting on behalf of Aref-Mohammed.

In 1987, 1988, and 1989 Samuel Posada-Rios received between 400 and 500 kilograms of cocaine per month. Espaillat estimated that from the beginning of 1987 through the summer of 1988 Samuel Posada-Rios received between 12,000 and 14,000 kilograms of cocaine, and that he received another 2,000 kilograms of cocaine

during the remainder of 1988.  Over 1,000 kilograms of this cocaine was supplied to Aref-Mohammed.[4]

In September of 1988 Espaillat distributed 60 kilograms of cocaine in Miami at Samuel Posada-Rios' direction.  He received $250,000 in cash in payment but was robbed of this money at gunpoint.  Samuel Posada-Rios ordered Espaillat to go to Colombia, where he was shown a severed arm and hand wearing the watch and ring that Espaillat identified as formerly belonging to the person who had robbed him.

**B.    Threats from Rival Drug Dealers and Retaliation by La Compania**

Carlos Palomino belonged to a rival drug gang from Buena Ventura, Colombia, called "Los Canoneros" (highjackers or cannoneers in Spanish) that was noted for stealing cocaine and money from rival drug dealers and for killing members of rival gangs.  In December of 1987 Samuel Posada-Rios told Espaillat that Palomino had stolen 5 kilograms of cocaine from the Posada-Rios organization and had molested a woman who was guarding the drugs.  Samuel Posada-Rios, Espaillat, Pepo Rendon, and other members of La Compania decided to kill Palomino after the Christmas holidays in retaliation and to ensure respect for La Compania.

On January 18, 1988, Rios-Castano and Edison Alvarez (a/k/a "Motor") were sitting inside the Miami Beat Disco in Houston when

---

[4]When the trial began Aref-Mohammed was a defendant.  On July 21, 1993, he pled guilty to a superseding information charging him with one count of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 pursuant to an agreement with the government.  He was sentenced to ten years in prison, three years of supervised release, a $50,000 fine, and a $100 special assessment.

Palomino and his girlfriend, Carolyn Tippett, arrived. Carlos Moncado-Rendon testified at trial that Rios-Castano related to him the following account of what happened at the club. Rios-Castano and Alvarez were sitting at the club drinking when Palomino arrived with two women. An argument ensued between Alvarez and Palomino, and Rios-Castano grabbed Alvarez and took him outside. Carolyn Tippett followed Rios-Castano and Alvarez outside and began arguing with Alvarez. Palomino followed Tippett out of the club. When Tippett tried to hit Alvarez in the face he pulled his gun and shot and killed her. During the defense portion of the case Rios-Castano described a similar, but more detailed, version of the Tippett killing. The thrust of both of Rios-Castano's versions was that Tippett's killing was a personal, rather than business related, matter. Tippett's murder was discussed at a subsequent meeting of La Compania members Samuel Posada-Rios, Rios-Castano, Miguel Cardona, and Espaillat. When Samuel Posada-Rios suggested that they should not have killed Tippett, Rios-Castano responded, "We killed her, so what."

On February 27, 1988, three carloads of Posada-Rios' men (including Miguel Cardona, Rios-Castano, Tumaco, Mikiquito, Moncada, and Pepo Rendon) went to the Thunderdome nightclub to kill Palomino. Although they shot Palomino numerous times as he came out of the club, Palomino escaped with only minor injuries. Robert Torres-Gonzalez (a/k/a "Gustavito"), a drug dealer who had been with Palomino at the club and who testified at trial, identified Rios-Castano as one of the gunmen, and Rios-Castano later pled guilty in state court of aggravated assault of Palomino.

-10-

Palomino retaliated on June 26, 1988, by murdering Pepo Rendon at the Miami Beat Disco. Samuel Posada-Rios then told Mikiquito to find out which of Palomino's people had killed Pepo Rendon and where they lived. Mikiquito identified Gustavito and Henry Barahona as Pepo Rendon's killers and identified a house where they could be found. On June 27, 1988, Samuel Posada-Rios, Rios-Castano, Moncado, Mikiquito, and others went to 2703 Skelton to kill Gustavito and Barahona. When they could not find Rendon's killers, they shot up the house, and another house at 11811 Green Lane.

On August 7, 1988, Samuel Posada-Rios, Miguel Cardona, Carlos Moncada Rendon, and Rios-Castano finally tracked Gustavito and Barahona to an apartment complex, laid in wait for them to leave, and retaliated for Pepo Rendon's murder. When four people emerged from the apartment, a gun battle ensued; Barahona was killed and Gustavito was shot nine times. Rios-Castano later pled guilty in state court to Barahona's murder. Samuel Posada-Rios bragged to Harold Cortes how Barahona's brain "splattered or exploded everywhere."

Barahona's murder forced Samuel Posada-Rios to leave the country. Espaillat drove him to Miami, and from there he went to the Dominican Republic, and ultimately to Colombia, where Espaillat delivered $3 million to him.[5]

---

[5]Samuel Posada-Rios was a fugitive at the time of the appellants' trial in 1993. On June 15, 1995, the United States extradited Samuel Posada-Rios from Frankfurt, Germany. In 1996 he was tried and sentenced to life in prison after a jury found him guilty of participating in a racketeering enterprise and possessing cocaine with intent to distribute it in violation of 18 U.S.C.

(continued...)

**C.    Samuel Posada-Rios Operates La Compania from Colombia**

1.  Ariel Ochoa and <u>Esnoraldo De Jesus Posada-Rios</u> take over the Houston operation

Samuel Posada-Rios continued his drug trafficking enterprise from Colombia, calling Espaillat on a daily basis.  Carlos Moncada took over the Houston enterprise until his arrest on September 9, 1988.  Samuel Posada-Rios then designated Ariel Ochoa as his successor in Houston to distribute Colombian cocaine.  Samuel Posada-Rios also designated his brother, <u>Esnoraldo De Jesus Posada-Rios</u>, as his local successor to collect money owed him for previous cocaine deliveries.  The money owed was recorded in ledgers that Espaillat retrieved from Samuel Posada-Rios' house and gave to Miguel Cardona and <u>Esnoraldo Posada-Rios</u>.

<u>Esnoraldo Posada-Rios</u> was arrested in August of 1988.  Samuel Posada-Rios instructed Espaillat to bond <u>Esnoraldo</u> out of jail and to find him a place to live.  Samuel Posada-Rios promised Espaillat 15 kilograms of cocaine for putting up <u>Esnoraldo</u>'s bond.  Espaillat complied and moved <u>Esnoraldo</u> to 9001 Jones Road, #1111, after bonding him out of jail.

After his release from jail <u>Esnoraldo</u> and Ariel Ochoa worked together at Samuel Posada-Rios' direction. (After his release from jail <u>Esnoraldo</u> also collected over $2 million of Samuel's drug debts.)  Ochoa had agreed with Samuel Posada-Rios to supply <u>Esnoraldo</u> with up to 150 kilograms of cocaine per week.  <u>Esnoraldo</u>

_____

(...continued)
§ 1962 and 21 U.S.C. § 846.

met with Ochoa at the Two Pesos restaurant on FM 1960 to arrange for additional deliveries of cocaine. Maximo Perez, a friend from the Dominican Republic whom Espaillat recruited to come to Houston, attended the meeting with Esnoraldo; and Ochoa was accompanied by Tatiana Bedoya, his girlfriend, and Elisa Grajales Murga, his ex-wife. After the meeting Murga and Bedoya delivered 25 kilograms to Esnoraldo at Ochoa's direction. Espaillat purchased 2 kilograms of this delivery. Again through Murga and Bedoya, Ochoa delivered a second 75-kilogram load to Esnoraldo and Maximo Perez in November of 1988.

In January of 1989 Esnoraldo Posada-Rios had arranged for Espaillat to make a cocaine delivery. Espaillat had spotted surveillance agents earlier that day. Afraid that he was about to be arrested, he called a friend from his car to retrieve the cocaine he was carrying. Although Espaillat delivered what he believed to be all of the cocaine to the friend, when his car was stopped by the police 1 kilogram was discovered on the back seat floorboard. The Jones Road apartment was searched later that day, and nine packages of cocaine, weighing paraphernalia, guns, and ammunition were seized.

Esnoraldo Posada-Rios talked to Espaillat two days after this arrest to locate the 3 kilograms of cocaine that Espaillat had turned over to his friend. Esnoraldo then fled to New York, where he ran Samuel Posada-Rios' New York cocaine distribution operation. New York police arrested Esnoraldo on January 24, 1990, at an

apartment where they also seized a machine gun, ammunition, and cocaine that belonged to him.

### 2. Elisa Grajales Murga

Elisa Grajales Murga assisted her ex-husband, Ariel Ochoa, in the cocaine distributing operation. Jose Antonio Ortiz testified that in March of 1989 Murga paid him $500 per kilogram to sell cocaine for her. He sold 1 or 2 kilograms, which he received from Murga's maid, Mercedes Alonzo, at Murga's house at 12806 Maxfield and for which he paid Alonzo. In late May of 1989 Ortiz negotiated a second delivery that was to occur in June of 1989.

On June 13, 1989, surveillance officers observed Ernesto Torres emerge from room #113 at a Manor House Motel with Murga carrying a large hard-sided suitcase, which Torres placed in the trunk of his car. Torres and Murga drove to her house at 12806 Maxfield, where police observed them carrying packages into the house. Police continued to follow Torres. Later that afternoon Torres met several unidentified Latin males, one of whom handed Torres a package from the trunk of his car.

On June 14, 1989, around 11:00 a.m., Murga met Carlos Guillermo Rodriguez and Torres at the Cafe Miami Restaurant. Murga then left the restaurant and returned to the Maxfield house. Around noon police observed a Latin male, later identified as Victor Rodriguez, carry a box from the Maxfield house and place it in the trunk of his car. Victor Rodriguez was later stopped by the police on an outstanding warrant, and 10 kilograms of cocaine were seized from his car. The cocaine was labeled "Oro" and "Peria."

-14-

The same day that she delivered cocaine to Victor Rodriguez, Murga called Ortiz three times at the restaurant to tell him that his cocaine was ready. Ortiz drove to Murga's house around 1:00 p.m. and spoke with Mercedes Alonzo, who told him that Murga had left him a package in a boat in Murga's garage. Ortiz and Alonzo loaded a large corrugated box from the boat into the trunk of Ortiz's car. Police later stopped Ortiz and seized 20 kilograms of cocaine from the box in his car.

The police then went to Murga's house and searched it with her consent. The police seized 10 kilograms of cocaine from the boat in the garage. The cocaine was packaged with the same "Oro" and "Peria" markings as the 30 kilograms previously seized from Rodriguez and Ortiz. Police also seized a bag containing 2.9 grams of cocaine from Murga's purse and a triple-beam scale from her house.

Olivia Alastre, a confidential informant working for the FBI, testified that in January of 1991 Murga was attempting to reestablish her contacts in the drug trafficking business. Murga first tried unsuccessfully to obtain cocaine from Fabio Zuniga, a friend of Ochoa's. Ochoa finally agreed to give her 30-40 kilograms. In April of 1991 Murga asked Alastre's assistance in renting an apartment to store the cocaine. She introduced Alastre to "Don Jose," whom Murga told Alastre she had employed to assist her in distributing the cocaine to reduce her personal involvement. Murga's address book, which she inadvertently left in Alastre's car, was photocopied by federal agents before it was returned. The

book contained names and telephone numbers of other documented drug traffickers.

**D.     Harold and Wonda Cortes**

Harold Cortes was one of Samuel Posada-Rios' best customers. When Ariel Ochoa took over the distribution of Samuel Posada-Rios' cocaine in Houston, Harold became one of his main assistants. When Samuel Posada-Rios fled to Colombia, Harold Cortes owed him between $125,000-$130,000; Ariel Ochoa offered to let Harold repay the debt by becoming one of his distributors.

Wonda Cortes was Harold's wife and a long-time drug dealer in her own right. Wonda had a large number of customers whom she was not able to supply because of her own limited supply of cocaine and the high cost she was paying for the cocaine. In the fall of 1990 Harold Cortes agreed to let Wonda distribute cocaine from Ochoa to these customers. By 1991 the Corteses were well established as major distributors in the Samuel Posada-Rios organization. Ledgers seized from Harold Cortes's residence on Sir William Street during a July 10, 1992, search reflected almost $72 million in drug proceeds and 5,753.3 kilograms of cocaine distributions.

Ariel Ochoa supplied cocaine to Harold Cortes through Tatiana Bedoya, Ochoa's girlfriend. Millions of dollars in drug proceeds collected by the Corteses were wired to Colombia through money laundering facilities known as "giro houses" in Houston or other cities. Bedoya worked at a giro house named "One Stop Express."

1.  The Harold Cortes Organization (Manuel Parada)

-16-

Wonda Cortes testified for the government at trial. She explained that the Posada-Rios drug trafficking enterprise operated like a corporation. Cocaine and money had to be accounted for, stored, and redistributed; and money had to be paid out for renting houses for living and stashing contraband, for cars for transporting drugs and money, and for pagers, telephones, scanners, and antisurveillance devices. To accomplish these tasks Harold Cortes employed Victor Loaiza (a/k/a Julio Jimenez), Hernan Moreno (a/k/a "Papo"), and Manuel De Jesus Parada.

Victor Loaiza met Ariel Ochoa in 1989. Loaiza testified that in early 1990 he flew from Miami to Houston at Ochoa's request to "take care of the money." Ochoa took Loaiza to an apartment, and Harold Cortes arrived at the apartment with $150,000 for Loaiza to guard. Loaiza remained in Houston about 1-1/2 months before returning to Miami. On his next trip he remained in Houston for 2-3 months. He helped count and guard $350,000 to $400,000. On three occasions Loaiza also transferred drug proceeds at Harold Cortes's direction in amounts ranging from $150,000 to $400,000 to a woman named "Bruni" and through Bedoya at One Stop Express.

Hernan Moreno and Manuel De Jesus Parada performed logistical services for Harold Cortes. They rented stash houses, cars, U-Haul trailers, telephones, and pagers. At Harold Cortes's direction they used false information in leases and applications, and changed residences periodically to minimize detection. Parada let Cortes and Moreno use his apartment at 2828 Rogerdale for registering car titles and applying for pager rentals. Moreno used Parada's

-17-

Rogerdale address on a purchase application for a gold Oldsmobile, which he bought with cash, and that was later discovered to have a hidden compartment.

Parada also rented a house at 9658 Angie Street in his own name at Harold Cortes's instruction. Moreno, who paid the rent, and "Alexis" and "Fernando (a/k/a Potes)" moved into the house to guard cocaine stored there. Loaiza testified that he also rented an apartment on Trailing Vine. At Harold Cortes's instructions Loaiza listed Parada as a reference on the lease application. Loaiza explained that it was essential to use Parada as a reference because Parada had the necessary credit card.

Harold Cortes paid Parada $1,000 per month. Parada's name appeared in drug ledgers reflecting "rent" payments for stash houses, cars, and other expenses of the drug operation. Wonda Cortes explained that the ledger notations reflected expenses for their drug enterprise. For example, one entry in a ledger stated "Manuel carro, phone car, phone house" next to the figure 3.0. Wonda Cortes explained that the entry referred to a $3,000 payment to Parada for expenses of the car and the house telephone bill.

Harold Cortes also hired Parada to drive a car from Miami to Houston. Parada was stopped by a Louisiana state patrolman for a traffic violation on May 18, 1991. He told the patrolman that he was transporting the car from Florida to Houston for a friend, whom he did not identify. The car contained a fresh odor of fiberglass and paint. After obtaining Parada's consent to search, the officer found an empty hidden compartment that had been built into the back

-18-

of the rear seat and operated by a sophisticated hidden release device wired through the air conditioning vent. The car was also equipped with air shocks, controlled by an air pump panel switch, to disguise the weight being carried in the vehicle. Parada denied any knowledge of the hidden compartment. Parada was issued a traffic citation and released. Loaiza testified that after this incident Harold Cortes considered the car to be ruined as a drug smuggling vehicle and gave it to Parada. Registration of this vehicle was later changed to Parada's name.

On July 18, 1991, DEA agents followed Loaiza in a gray Dodge rented by Parada from the Angie Street house to an apartment at the Stonefield Village complex. Loaiza entered the apartment empty-handed and left carrying a shoulder bag. When Loaiza was stopped by police officers and searched, he had $73,405 in cash and a digital pager. Loaiza identified this cash as drug proceeds received from "Hubert," an associate of Harold Cortes who lived at the Stonefield Village complex. Loaiza was stopped en route to delivering the money to Cortes. A digital pager in Loaiza's possession reflected a coded message from Parada.

After the July 18, 1991, seizure of drug proceeds Ariel Ochoa instructed Loaiza to return to Miami, and he did so the next day. Law enforcement agents continued to follow Moreno and Parada. On August 6, 1991, agents saw Hernan Moreno and Parada arrive at a Captain Benny's restaurant around 6:50 p.m. Moreno made several calls from a pay telephone at the rear of the restaurant. The calls appeared to be made to a beeper. The two men then drove from

the restaurant to an Exxon station next door and made more calls from a pay telephone there. They then returned to Captain Benny's and made more calls from the pay telephone there. Around 7:20 p.m. Moreno and Parada left the Captain Benny's restaurant and drove to the Stonefield Village apartment complex and went inside apartment #1804. Fifteen minutes later the two men came out of the apartment, one of them carrying a purple gym bag. Moreno and Parada then drove to Harold Cortes's residence at 19803 JoanLeigh. Moreno carried a half-full brown grocery bag into the residence. A few minutes later Parada came out of the JoanLeigh residence carrying a purple gym bag. He got into a different car with two women and drove to 9658 Angie, where he took the gym bag into the residence. Fifteen minutes later Parada left the Angie residence without the gym bag with the two women and drove to a Two Pesos restaurant. There was no direct evidence of the contents of the grocery bag or the purple gym bag.

Pen registers from the three telephone lines that Parada had installed at his Rogerdale residence reflected 238 calls from Harold Cortes during the period from June 5, 1991, through January 15, 1992. In a telephone conversation intercepted pursuant to a Title III wiretap on March 5, 1992, Jaime Cardenas told Parada that he had "papers" to bring him. Wonda Cortes testified that she used the term "papers" in telephone conversations to refer to money. In a statement made to DEA agent Mike Schaefer after his arrest in August of 1992 Parada stated that Hernan Moreno had stopped him from walking down the hallway of one of the rented

-20-

houses and told him that "you don't need to see what's down there." Parada told agent Schaefer that at that point he knew Harold Cortes and Hernan Moreno were "up to no good."

### 2. The Wonda Cortes Organization

Wonda Cortes distributed cocaine to her brother, Richard Winston Hall,[6] Mona Smith Watson, Tony Jones, Carmenza Guzman Varon, Mary Helen Hermann, Anthony Jerome Gage, and Kelvin Jackquet.

#### a. Mona Smith Watson and Tony Jones

Tony Jones began as one of Wonda Cortes's customers and became one of Harold Cortes's largest customers. Through Mona Smith Watson, Jones' girlfriend and the mother of his child, Harold Cortes distributed large amounts of cocaine. Watson assisted Jones by retrieving and delivering cocaine-laden vehicles supplied by Harold Cortes and returning drug proceeds to Cortes. Tony Jones was murdered in 1991. At the time of his death Jones owed Harold Cortes $360,000 for drug purchases. Harold asked Watson for assistance in collecting drug debts owed by Jones, and Watson gave Harold Cortes a list of people who owed money to Jones.

---

[6] Some of Wonda's distributors' customers also bought cocaine from Harold. Wonda's brother, Richard Winston Hall, also made deliveries for Harold Cortes. Hall and Harold Cortes made a number of cocaine deliveries to Conroe, Texas, in 1989. At Harold's direction and with his money, Hall purchased a pickup truck in his name on February 17, 1991. Harold Cortes was stopped while driving this truck in Louisiana on March 20, 1991. A search of the truck uncovered a black overnight bag containing $126,053, vehicle registration documents in Hall's name, and an insurance contract in Ochoa's name. Wonda Cortes identified this money as drug proceeds.

After Tony Jones was murdered Wonda Cortes agreed to continue supplying Mona Smith Watson with cocaine for the customer base that Jones had developed during his drug trafficking activities with Harold Cortes. Watson acted primarily as a broker in these transactions. She would contact the customers, determine how much cocaine they wanted, and call Wonda Cortes and put the customer in contact with her. For her role as a broker Watson was paid from $500 to $1,000 per kilogram. In a statement made to the FBI at the time of her arrest, Watson also admitted personally buying and distributing 3 kilograms of cocaine in addition to her brokering activities.

   b. Mary Helen Hermann

Mary Helen Hermann was a long-time drug dealer who testified for the government at trial. In 1987 Hermann supplied Wonda Cortes with cocaine from a supplier named Mario Moreno in Los Angeles. Wonda Cortes later told Hermann that she would no longer deal with Moreno because she could get a better price and had easier access to cocaine through Samuel Posada-Rios. In mid-1988 Hermann moved from Los Angeles to Wonda Cortes's residence on Hearthstone in Houston and began assisting Wonda and accompanying her on deliveries of cocaine received from the Posada-Rios organization through Harold Cortes.

Hermann described instances when Wonda Cortes and Mona Smith Watson distributed cocaine together and counted the proceeds. Hermann also picked up a load of cocaine for Wonda Cortes at the Port of Houston. Hermann and her brother went to the port

-22-

pretending to sell electronic equipment. They took a television set onto a ship and two sailors loaded 24 kilograms of cocaine inside the television. Hermann and her brother delivered the television set to Wonda Cortes and were each paid $12,000. In late 1991 or early 1992 Hermann assisted Wonda Cortes and Tatiana Bedoya in counting $500,000 at Wonda's house on Corral Street. Cortes and Bedoya delivered the money to Ochoa later that evening.

c. Anthony Jerome Gage and Kelvin Jackquet

In August of 1991 a large shipment of cocaine arrived in Houston. In August and September of 1991 Wonda Cortes made four large cocaine sales. Wonda delivered 14 kilograms to Watson and Anthony Jerome Gage a/k/a "Bo" at a price of more than $14,000 per kilogram. This was the first time Wonda Cortes had met Gage. Wonda Cortes delivered another 20 kilograms to Gage at the apartment of his brother, Kelvin Jackquet a/k/a "Pop," at 2425 Holly Hall, apartment #B-25. Gage paid Cortes for part of the price for the cocaine, and Mona Smith Watson paid Cortes the rest of the sales price. Wonda Cortes made a third, 25-kilogram sale, at $14,500 per kilogram, at Jackquet's apartment on Holly Hall. Present during this sale were Gage, Jackquet, Wonda Cortes, and Carmenza Guzman Varon. Gage delivered the balance of the payment for the 25 kilograms to Wonda Cortes at a "stash house" that she rented on El Mundo Street under the alias "Alexis Caron"; and Wonda Cortes, Carmenza Guzman Varon, and Wonda's brother, Richard Winston Hall, counted about $350,000 in cocaine receipts. In September of 1991 Wonda Cortes made a fourth delivery of 40 kilograms to Gage at

-23-

the apartment of Gage's sister, Yolanda Gage.  Present during the delivery were Wonda Cortes, Carmenza Varon, and Gage.  Gage made a $300,000 or $400,000 down payment for the cocaine and took the rest on consignment, with the balance to be paid after Gage sold the cocaine.

### d.  Carmenza Guzman Varon

Carmenza Guzman Varon (a/k/a "Menchie") began working for Wonda Cortes in May or June of 1991 at a clothing store Cortes owned.  In July of 1991 Varon agreed to supply cocaine to Olivia Alastre.  Alastre would sell the cocaine to her customers, and Alastre and Varon would split the proceeds equally.  On August 15, 1991, Alastre gave Varon $15,000 for 1 kilogram of cocaine at Varon's apartment at 7222 Bellerive.  On October 2, 1991, Wonda Cortes made a second 1-kilogram delivery to Alastre through Wonda's younger brother, Richard Winston Hall.  Hall handed the cocaine to Varon, who handed it to Alastre.

### e.  November 15-16, 1991, distributions to Gage, Jackquet, Watson, and Varon

By November of 1991 federal authorities had placed a wiretap on one of Wonda Cortes's cellular telephones and began recording conversations detailing her drug trafficking activities.  In a conversation recorded on November 8, 1991, Anthony Jerome Gage told Wonda Cortes that he had lost $100,000 at the airport and that someone "got hit 76 times," meaning that the police had confiscated 76 kilograms of cocaine.  Wonda Cortes told Gage that his brother, Kelvin Jackquet, was short $4,640 in his cocaine payments.  (This

-24-

shortage was also reflected in Wonda's drug ledger; it was paid on November 15, 1991.)

A series of conversations were recorded on November 13, 1991. Wonda Cortes testified about the code phrases the participants used in the calls to conceal drug quantities and prices. In the first call Kelvin Jackquet told Wonda Cortes that he was ready to buy cocaine from someone else. Wonda replied that she was expecting another delivery of cocaine in a day or so. In a later call that day with Jackquet and Gage, Wonda Cortes confirmed the load was coming but could not quote a price. In a conversation between Mona Smith Watson and Wonda Cortes, Watson told Wonda that she needed to make some money selling cocaine. Wonda replied that she had 5 kilograms to sell and Watson asked to buy it. Bedoya called Wonda Cortes to tell her that she had been notified that the expected load of cocaine had arrived in Houston.

The arrival of the load of cocaine sparked a series of telephone calls on November 14, 1991. Wonda Cortes notified Gage, Roy Ford, and Jackquet that she was on her way to pick up the cocaine. Jackquet wanted 3 kilograms. Wonda quoted Ford a price of $14,500 per kilogram; and she quoted Watson a price of $14,000.

Tatiana Bedoya delivered 15 kilograms of cocaine to Wonda. Wonda stored it at a stash house she had rented at 1115 Augusta, #31, under the alias Alexis Caron. Carmenza Varon was living at the house to guard the cocaine. From this shipment of cocaine Wonda delivered 1 kilogram to Ford on November 14, 1991.

Mona Smith Watson wanted 8 kilograms but only had the money to buy 4. She later called Wonda Cortes to tell her that she had

-25-

the money for 5 kilograms. Wonda delivered 4 kilograms to Watson, and Wonda made another 1-kilogram delivery to "Andrea" the next day at Watson's request.

In a coded conversation between Wonda Cortes, Carmenza Varon, and Janeth Varon, Janeth told Wonda that she had "dresses" (kilograms of cocaine) she wanted to sell in Wonda's shop. Wonda replied that "most of the things I take in are "11 and 11-1/2," meaning $11,000 to $11,500 per kilogram. Janeth's price was too high and Wonda did not want to deal with her.

Wonda Cortes and Richard Winston Hall made a cocaine delivery to Kelvin Jackquet and Anthony Gage on November 15, 1991, at a house on Calumet. This delivery was referenced in Wonda's ledgers as 2 kilograms at $14,300 each. Jackquet was short $100. In a subsequent conversation, Wonda informed Jackquet that he was $200 over, and that she would credit the amount against his outstanding cocaine balance. Wonda also told Jackquet that she was going to have additional cocaine to sell him. Wonda delivered her remaining 7 kilograms of cocaine to Jackquet on November 16, 1991. On November 16, 1991, after receiving payment for the sale of this cocaine, Wonda Cortes, Carmenza Varon, Richard Hall, and Donald Wayne Woods counted it in a room at the Holiday Inn Crowne Plaza at the Houston Galleria. While there Wonda received a phone call from a Colombian with a Cali accent whose voice she did not recognize. He warned her that one of her associates was an informant and that "there was a tail" on her. They quickly gathered the money and left the hotel. In a conversation with Mona Smith Watson on

-26-

November 18, 1991, Wonda Cortes referred to having "loose ends," meaning she had people around her who were making mistakes. Wonda Cortes wanted to consolidate her cocaine deliveries to Watson into one daily load.

> f. December 10-11, 1991, distributions to Watson, Gage, Jackquet, Carmenza Varon, and Janeth Varon

On November 26, 1991, Jackquet asked Wonda Cortes if she could obtain 2 kilograms of cocaine for him. Wonda replied that a shipment was coming but that she did not yet have any cocaine.

Wonda Cortes received 50 kilograms of cocaine from Tatiana Bedoya on December 10, 1991. With Wonda Cortes's acquiescence, Bedoya agreed to lend Harold Cortes 10 of the 50 kilograms. Wonda Cortes then began contacting her distributors to sell the rest of the cocaine. In a 10:37 a.m. telephone conversation with Jackquet on December 10, 1991, Wonda told him to "sit still" because she was awaiting delivery of the cocaine. At 2:36 p.m. Wonda told Mona Smith Watson that "everything is everything," meaning that she had the cocaine in hand. Wonda Cortes also told Watson that the price would be around $14,400 per kilogram and she would confirm the price to Watson over her digital pager. In these conversations Wonda cautioned both Jackquet and Watson about talking over the telephone. Kelvin Jackquet and Anthony Gage spoke with Wonda Cortes three times between 3:02 and 3:39 p.m. Wonda stated that a "plentiful" cocaine load had arrived, and Gage stated that his customers were ready. At 4:17 p.m. Wonda told Mona Smith Watson that she had the cocaine, and Watson replied that she had to get

-27-

the "papers (i.e., money) together."  At 4:21 p.m. Wonda told Jackquet that she had the cocaine but that she would not deliver the amount he requested to him on consignment.  At 4:31 p.m. Roy Ford called requesting 1 kilogram.  At 4:52 p.m. Mona Smith Watson called and ordered 3 kilograms.

Later that afternoon, while still negotiating sales to other customers, Wonda Cortes began delivering the cocaine she had sold earlier in the afternoon.  At 6:11 p.m. Wonda arranged with Watson to meet Andrea at the Children's Etc. in the Galleria to deliver 2 kilograms of cocaine.  Wonda made the delivery later that evening. By 8:20 that evening Wonda Cortes told Mona Smith Watson that she only had 25 kilograms of cocaine left.

Wonda met Roy Ford later that evening at a shopping center and delivered 1 kilogram of cocaine to him.  Ford was driving a white Lincoln Continental limousine that the agents had seen in November.  A DEA agent observed Wonda Cortes remove a light-colored bag from her vehicle, place it in the limousine, and leave.  The limousine was followed and stopped by Houston police officers for a traffic violation, and Ford was arrested.  Four clear plastic bags containing 128 grams of cocaine were recovered from the front seat transmission hump of Ford's car.

Wonda Cortes made two deliveries to Kelvin Jackquet on December 10.  The first, a 3-kilogram delivery, was made around 6:15 p.m. to Jackquet's Holly Hall apartment.  Jackquet paid Wonda in cash.  Wonda made the second 1-kilogram delivery to Jackquet at a strip shopping center later that evening.  Surveillance agents

-28-

followed Wonda and saw her park beside a white pickup truck occupied by Jackquet and Gage. Jackquet got out of his truck and joined Wonda in her vehicle for 2-3 minutes. Wonda handed him a dark-colored plastic bag from the back seat and Jackquet returned to his pickup truck.

While making cocaine deliveries during the evening of December 10, 1991, Wonda Cortes was also negotiating a 5-kilogram sale to Janeth Varon through her sister, Carmenza Varon. At 5:36 p.m. Carmenza Varon called Wonda. Later that evening Wonda delivered 5 kilograms of cocaine to the Varon sisters at a Shipley's Do-Nut Shop on Veteran's Memorial Drive. A DEA agent watched the transaction. The Varon sisters retrieved a gray plastic bag from Wonda's Lincoln Continental and put it in the trunk of the red Chevrolet they were driving. In return the Varon sisters gave Wonda Cortes a brown paper bag. The Varons were later stopped by HPD officers and Janeth Varon was arrested. Inside the gray bag was a telephone box containing 5 kilograms of cocaine. Carmenza Varon called Wonda Cortes the next day to discuss the arrest. Wonda was upset over losing the cocaine because she would have to explain the loss to Ariel Ochoa and was concerned that Janeth could implicate her as the source of the cocaine. Wonda met with Ochoa, Harold Cortes, Tatiana Bedoya, and Hernan Moreno the next day to discuss the seizure. Harold Cortes was concerned that if Wonda "brought the heat" everybody would go to jail.

Wonda Cortes testified that while making the December 10 deliveries, she drove around Houston carrying both cocaine and

large amounts of cash.  She delivered the drug proceeds to her house on Corral Street.  She continued negotiating cocaine sales on December 11, 1991.  Around 6:30 p.m. she delivered 1 kilogram to Jackquet and Gage at a location on Yellowstone and Lozier, near a "Dr. Chuck's" auto shop.  Earlier that day she had tried to convince Donald Wayne Woods to take at least 4 kilograms.  After the Jackquet delivery Wonda delivered 15-17 kilograms of cocaine to Woods at his residence.  She was there 3-4 hours and saw his customers come and go.  Wonda Cortes and Mary Hermann checked into the Residence Inn on December 12, 1991, to count the drug proceeds.

g.  January 1992 distributions

Wonda Cortes received another load of cocaine in January of 1992.  Roy Ford called Wonda on January 8, 1992, asking if she still had the cocaine and requested a kilogram.  Richard Winston Hall assisted Wonda in delivering at least 2 kilograms of cocaine to Mona Smith Watson in January of 1992.  Hall testified that in January of 1992 he also made a 2-kilogram delivery and a 1-kilogram delivery to Ford, and a 4-kilogram delivery to Kelvin Jackquet.  Each time he returned the money to Wonda Cortes.  Hall also testified at trial that he delivered cocaine supplied by Wonda Cortes to Ford in February, March, and April of 1992 and returned the money to Wonda.

## E.    Mona Smith Watson's Cocaine Distributions

Like many of Wonda Cortes's customers, Mona Smith Watson had other sources of cocaine and her own network of customers for the

-30-

cocaine she obtained.  Watson shopped around for the lowest price and the best terms.  On January 10, 1992, Wonda Cortes quoted Watson a price of $14,100 per kilogram.  Wonda agreed to lower the price if Watson purchased at least 20 kilograms.  In a January 16, 1992, conversation Wonda offered to sell Watson 10 kilograms at a time at $13,500 per kilogram.  This was the same price she was then quoting to Kelvin Jackquet.  (Wonda quoted Richard Winston Hall a discounted price of $13,200 because he was her brother.)

Mona Smith Watson's customers included "Paula," "Stan," and Linda Jones, the mother of Watson's murdered boyfriend, Tony Jones.  The cocaine that Watson purchased from Wonda Cortes in January of 1992 was for Paula.  Wonda Cortes, Hall, and Watson delivered a few kilograms of cocaine to Stan at his residence in Missouri City, Texas, in December of 1991 or January of 1992.  Stan wanted to deal on a regular basis directly with Wonda, but she refused to do so because Stan was Watson's customer.

Most of Mona Smith Watson's cocaine was supplied by Wonda through Carmenza Varon.  In the late spring to early summer of 1992 Wonda Cortes and Mary Hermann made six deliveries in amounts ranging from 10 to 30 kilograms to Watson, who would send Linda Jones to pick up the cocaine.  Linda Jones picked up three of the loads of cocaine from Carmenza Varon at her apartment on 2205 Hayes Road.  Carmenza Varon later moved to 2801 Walnut Bend and delivered cocaine to Linda Jones from that location.

In the spring of 1992 Mona Smith Watson was also dealing directly with Ariel Ochoa, who was suppling Watson with cocaine through Jaime Cardenas.  Cardenas had started out as one of Harold

-31-

Cortes's subordinates but had become one of Ariel Ochoa's major distributors by January of 1992. Wonda Cortes believed that Cardenas had been skimming money from her drug payments to Ochoa and blaming her for the shortages. Mona Smith Watson experienced a similar problem; in February of 1992 Ariel Ochoa called Watson complaining that a cash delivery from Watson to Ochoa through Cardenas was short $5,000.

**F.     Anthony Gage and Kelvin Jackquet's Cocaine Distributions**

Kelvin Jackquet and Anthony Gage redistributed the cocaine they purchased from Wonda Cortes and Mona Smith Watson. One of Jackquet and Gage's drug transporters was Charles White, who ran a vehicle body shop called "Dr. Chuck's Auto Hospital." White testified that beginning in December of 1991 he delivered cocaine for Gage. For his first delivery Jackquet and Gage gave White cocaine, which he hid in the doors of a rented U-haul truck. White drove the truck to Atlanta where, as Gage directed, a man picked up the truck from White. Gage provided White a plane ticket to return from Atlanta to Houston and paid him $1,500 for transporting the cocaine.

White made a second trip to Atlanta about a week later, driving a blue Chevy Malibu. Both Gage and Jackquet were with White when he picked up the car. When White picked up the car there was a black bag with cocaine inside. At the direction of Gage and Jackquet, White hid the cocaine in the car's spare tire. White drove the car to Atlanta where he delivered part of the

cocaine to Gage and part to another man at Gage's direction and was paid by Gage.

White made a third and final trip to Atlanta on January 14, 1992.  He drove the same blue Chevrolet.  White put the cocaine in a car door and in the spare tire.  Gage and Jackquet paid White $600 before he left Houston.  Late that evening sheriff's deputies in Atlanta stopped White for not wearing a seat belt.  After White consented to a search of the car the deputies found a .22 caliber handgun in a soft eyeglass case on the front passenger floorboard.  They also found five packages of cocaine and four packages of marijuana in the car's spare tire.  During a later interview White told the deputies that more cocaine was concealed in the right door panels, and three additional packages of cocaine were found there.

## G.    Raul Gamboa and Carlos Mena

Mary Hermann testified that she first met Carlos Antonio Mena a/k/a Gaspar Prado in early 1987 in Houston.  At the time Hermann was transporting cocaine for Jose Mosquera.  In Mosquera's apartment Hermann saw a drug ledger that belonged to Mena.  The ledger contained figures representing distributions of kilogram quantities of cocaine.  Mena took the ledger away from Hermann and told her not to look in it.  In September of 1989 Mena was convicted in state court of Panola County, Texas, of aggravated possession of cocaine after law enforcement officers found 11 pounds of cocaine in a car he was driving.

In October of 1991 Wonda Cortes began using Tatiana Bedoya as a direct source of supply for cocaine instead of buying the

-33-

cocaine through her estranged husband, Harold Cortes. Bedoya agreed to supply the cocaine in return for Wonda splitting the profits 50/50. In early November of 1991 Bedoya attempted to find a source of cocaine apart from the Samuel Posada-Rios organization. On November 7, 1991, she flew to Los Angeles to meet with Carlos Mena, whom she had known since 1988. Carlos Mena arranged for Wonda to meet with "El Negro"[7] to discuss the possibility of obtaining cocaine from a source not associated with Harold Cortes. Although Wonda and Mena continued to discuss a possible purchase of cocaine from Mena for several months, no purchase ever materialized from the discussions with El Negro or Mena. There was no evidence, either from Wonda's trial testimony or the recorded conversations between Wonda and Mena, that Wonda told Mena about the Posada-Rios organization or any of her co-conspirators in the organization.

On August 11, 1992, at around 5:45 p.m., United States Customs Service agents observed Raul Gamboa, Mena, and a woman arrive at "Giro El Calima," a money exchange, in a tan Nissan Maxima. A confidential source had told the agents that money laundering was occurring at the giro house. The woman remained in the car while Gamboa and Mena "scanned" the cars in the parking lot. The men then walked empty handed into the giro house, remained inside for 10-15 minutes, and came out carrying a red and black gym bag that appeared to be quite heavy. Gamboa and Mena

---

[7]Wonda Cortes testified that the nickname "El Negro" was common for Colombian drug dealers. This "El Negro" was not associated with the Samuel Posada-Rios enterprise.

again scanned the parking lot before they got back in their car. Gamboa put the bag in the trunk of the car.

Agents followed the Nissan and noticed Mena making cellular telephone calls. The Nissan proceeded to the Collingsford Apartments, where it drove through a coded gate to the back of the apartment complex and then exited through another gate. The Nissan then circled around the complex and proceeded to the Rustic Village Apartments. Customs Agent Peter Lattanci, who participated in the surveillance of the Nissan, testified that these maneuvers were typical of a "heat run" -- a tactic commonly used by drug traffickers to detect surveillance. At the Rustic Village Apartments Mena, Raul Gamboa, and the woman who was with them went into apartment #181. A few minutes later a blue Mercury Sable, driven by Esmeralda Hooker, arrived and Hooker went into apartment #181.

Mena, Gamboa, and Hooker left the apartment together and proceeded in the blue Sable to the Collingsford Apartments, where they parked the car. Dressed in raid jackets, agents approached Gamboa and Mena as they got out of the car. A Spanish-speaking officer informed Gamboa that the agents were investigating drug and money laundering activities at Giro El Calima. Gamboa consented to a search of the car and signed a Spanish language "Voluntary Consent to Search and Seize" form. Agents recovered a plastic bag that contained $34,000 in cash from the right rear passenger area of the car where Mena had been sitting.

When asked in Spanish about going to the Rustic Village Apartments, Gamboa stated he had driven Hooker there to visit her friends; and Mena stated that he had just been picked up by Gamboa

and Hooker from a bus stop near the apartments. Both <u>Gamboa</u> and <u>Mena</u> denied being at the Giro El Calima or knowing anything about the Nissan Maxima. <u>Gamboa</u> and <u>Mena</u> were not arrested but agreed to follow the agents back to the Rustic Village Apartments. There, the Nissan Maxima was pointed out to both <u>Mena</u> and <u>Gamboa</u>, and they again denied any knowledge of the vehicle -- which was registered to <u>Mena</u> -- or of apartment #181. The agents called a drug detection dog to the scene, and it alerted them to the trunk of the Nissan. After <u>Gamboa</u> consented to a search of the car agents seized from the trunk the red and black gym bag, which contained 9 packages of cocaine wrapped in plastic tape, and $4,000 in cash in the glove compartment, and arrested <u>Mena</u> and <u>Gamboa</u>. An hour or two later <u>Mena</u> admitted that he had owned the Nissan, but stated that he had sold it, but could not recall to whom.

## H.    The Demise of La Compania

DEA agents searched Harold Cortes's residence on Sir William Street on July 10, 1992. They seized drug ledgers, cellular telephones, anti-surveillance equipment, a sophisticated scanner, photographs, and various documents.

Wonda Cortes was arrested on July 21, 1992. On July 23, 1992, agents executed a search at her residence at the Legend Point Apartments. They seized several cellular telephones, a pink drug ledger, a blue drug ledger, and numerous other documents and notebooks. Analysis of Wonda Cortes's drug ledgers documented the receipt of $3,952,402 in drug proceeds for cocaine sold to customers in 1991 and 1992. Cortes testified that she "doctored"

this ledger to reflect lesser amounts to cheat Bedoya out of profits.

On August 13, 1992, fifteen raid teams participated in the simultaneous execution of arrest warrants for Elisa Murga, Ford, Manuel Parada, Hall, Donald Wayne Woods, Kelvin Jackquet, and Mona Smith Watson and execution of search warrants for various premises. Watson was arrested at her mother's residence. A search of Watson's apartment on Greenbriar uncovered photographs, notebooks, and drug ledgers. Carmenza Varon's residence on Walnut Bend was searched and agents seized drug ledgers, a money counting machine, an address book, and other documents noting prices for varying amounts of cocaine.

When agents arrived at 10538 Farmington in Houston to execute a search warrant and a warrant to arrest Kelvin Jackquet, they saw a silver Nissan drive away. The agents stopped the vehicle and spoke with the driver, Marla Jackquet, Kelvin Jackquet's sister. Marla told the agents that Kelvin Jackquet was in the downstairs bedroom, and Marla gave agents keys to the burglar bars that protected the house. Agents unlocked the burglar bars and announced their presence loudly several times. When the agents entered the house they again announced their presence. As agent Renaldo Ollie approached the downstairs bedroom, he told Kelvin Jackquet to come out and that agents had a warrant for his arrest. As agent Ollie reached inside the room to turn on the lights, he heard what appeared to be the sound of someone chambering a round in a shotgun. Agent Ollie yelled out "shotgun" loudly to warn

other agents. Agent Ollie then backed out into the hallway. As he did so he saw someone run down the hallway carrying a shotgun into the utility room that led to the garage. Agent Ollie then heard the garage door opening and heard several shots. DPS agent Larry Allen was securing the perimeter approximately 8 feet from the garage door. Allen was wearing a raid jacket labeled "DPS" and "Police" in large letters. As <u>Jackquet</u> came out of the garage he shot Allen in the chest. Although Allen was wounded in the hand and arm, his body armor prevented more serious injury. Agent Allen returned fire and one bullet grazed <u>Jackquet</u>'s left shoulder blade. Agent Ollie then ran outside and saw <u>Jackquet</u> standing with the shotgun. Ollie told <u>Jackquet</u> to drop the shotgun. <u>Jackquet</u> dropped the gun and ran, but other agents quickly arrested him. Approximately $32,000 in cash and an address book were seized from a nightstand next to <u>Jackquet</u>'s bed and two pistols were seized from beneath his mattress.

## II. <u>VERDICTS AND SENTENCES</u>

<u>Esnoraldo De Jesus Posada-Rios</u> was convicted of count 1 (conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d)), count 2 (participation in a racketeering enterprise in violation of 18 U.S.C. § 1962(c)), and count 3 (conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846). Posada-Rios was sentenced to concurrent terms of life in prison, followed by 10 years of supervised release, and was ordered to pay $150 in special assessments.

-38-

Carlos Antonio Mena was convicted of counts 1 and 3 and of counts 42 and 43 (conspiracy to possess with intent to distribute cocaine and possession with intent to distribute it in violation of 21 U.S.C. §§ 841(a) and 846). He pled guilty to count 46 (unlawfully reentering the United States after deportation and commission of an aggravated felony in violation of 8 U.S.C. § 1326(a)). Mena was sentenced to concurrent terms of 240 months in prison on counts 1, 3, 42, and 43 and a 180-month concurrent prison term on count 46, followed by 10 years of supervised release, and was ordered to pay $250 in special assessments.

Elisa Grajales Murga was convicted of counts 1 and 3 but was acquitted of count 2. She was also convicted of count 41 (possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)) and count 48 (making a false statement on an application for immigrant visa in violation of 18 U.S.C. § 1546(a)). Counts 37-40 (possession with intent to distribute cocaine) and count 53 (possessing a firearm as an illegal alien in violation of 18 U.S.C. § 922(g)(5)) were dismissed on the government's motion. Murga was sentenced to concurrent terms of 292 months in prison on counts 1, 3, and 41 and 60 months in prison on count 48, followed by 5 years of supervised release, and was ordered to pay $200 in special assessments.

Carmenza Guzman Varon was convicted of counts 1, 2, and 3. She was also convicted of counts 11, 12, 13, 22, 23, and 24 (possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)), but was acquitted of counts 6, 21, and 25, which

also charged her with violating § 841(a)(1).  Varon was sentenced to concurrent terms of 292 months in prison, followed by 5 years of supervised release, and was ordered to pay $450 in special assessments.

Raul Gamboa was convicted of counts 42 and 43 (conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1)).  He was sentenced to concurrent 121-month prison terms, followed by 5 years of supervised release, and was ordered to pay $100 in special assessments.

Luis Gerardo Rios-Castano was convicted of counts 1 and 2, and pled guilty to count 45 (unlawfully reentering the United States after deportation and commission of an aggravated felony in violation of 8 U.S.C. § 1326(a)).  He was sentenced to life in prison on counts 1 and 2 and a concurrent 180-month prison term on count 45, followed by 5 years of supervised release, and was ordered to pay $150 in special assessments.

Manuel De Jesus Parada was convicted of counts 1 and 3.  He was sentenced to concurrent terms of 151 months in prison, followed by 5 years of supervised release, and was ordered to pay $100 in special assessments.

Anthony Jerome Gage was convicted of counts 1, 2, and 3.  He was also convicted of count 5 (conspiracy to possess with intent to distribute cocaine), but was acquitted of counts 6 and 21, which charged him with the same offense.  Gage was sentenced to concurrent terms of 300 months in prison, followed by 5 years of

-40-

supervised release, and was ordered to pay $200 in special assessments.

Kelvin Jackquet was convicted of counts 1, 2, and 3 and of count 52 (use of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)). He pled guilty to count 27 (possession with intent to distribute cocaine). Jackquet was acquitted of count 6 (possession with intent to distribute cocaine). The court granted his motion for a mistrial on count 26 (possession with intent to distribute cocaine). Jackquet was sentenced to concurrent terms of 235 months in prison on counts 1, 2, 3, and 27 and a consecutive 60-month prison term on count 52, followed by 5 years of supervised release, and was ordered to pay $250 in special assessments.

Mona Smith Watson was convicted of counts 1, 2, and 3 and of counts 5, 7, 8, 10, 11, 12, and 13 (possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1)). She was acquitted of count 6. Watson was originally sentenced to concurrent terms of 360 months in prison, followed by 5 years of supervised release, and was ordered to pay $500 in special assessments. On September 23, 1996, an Amended Judgment was entered reducing her term of imprisonment to 292 months pursuant to 18 U.S.C. § 3582(c)(2) because of a retroactive amendment to the Sentencing Guidelines that lowered Watson's guideline range.

### III.  DISCUSSION

A.    Sufficiency of the Evidence Challenges

-41-

Mena, Murga, Varon, Gamboa, Parada, Gage, and Jacquet contend that the evidence was insufficient to sustain some or all of their convictions.[8]  In reviewing the sufficiency of the evidence we view the evidence and all inferences to be drawn from it in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See <u>United States v. Sneed</u>, 63 F.3d 381, 385 (5th Cir. 1995).[9]

1.  RICO, 18 U.S.C. § 1962(c)

The substantive RICO statute charged in the indictment, 18 U.S.C. § 1962(c), prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  To establish a violation of § 1962(c) the government must prove (1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was "employed by" or "associated with" the enterprise, (3) that the defendant partici-

_____

[8]Although defendants attempt to adopt the claims raised by each other as provided by Fed. R. App. P. 28(I), this court does not allow an appellant to adopt fact-specific challenges, such as sufficiency of the evidence, to support a conviction or sentence. See <u>United States v. Moser</u>, 123 F.3d 813, 819 n.3 (5th Cir.), <u>cert. denied</u>, --- U.S. ---, 118 S. Ct. 642 (1997); <u>United States v. Alix</u>, 86 F.3d 429, 434 n.2 (5th Cir. 1996).

[9]Because none of the parties have raised the issue and because the government contends in its brief that this is the appropriate standard of review, the court assumes that each of the defendants made all appropriate motions to preserve this issue for review.

-42-

pated in the conduct of the enterprise's affairs, and (4) that the participation was through "a pattern of racketeering activity." United States v. Erwin, 793 F.2d 656, 670 (5th Cir. 1986).

Gage argues that the government failed to establish that he participated in the conduct of the affairs of the enterprise as required by Reves v. Ernst & Young, 507 U.S. 170, 113 S. Ct. 1163 (1993). In Reves the Court held that to be convicted of a substantive RICO offense under § 1962(c), "one must participate in the operation or management of the enterprise itself." Reves, 507 U.S. at 185, 113 S. Ct. at 1173. The Court concluded that in enacting § 1962(c) Congress intended "participate" to have the "common understanding of the word . . . 'to take part in.'" Id. at 179, 113 S. Ct. at 1170. The Court specifically rejected the D.C. Circuit's suggestion that § 1962(c) requires significant control over or within an enterprise. Id. at 179 n.4, 113 S. Ct. at 1170 n.4. The Court held that "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise. . . ." Id. at 179, 113 S. Ct. at 1170. The Court explained that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." Id. at 184, 113 S. Ct. at 1173. Because the Court found that the petitioner, an outside accounting firm engaging in the valuation of a farming cooperative, was clearly not involved in

-43-

the management of the enterprise or acting under direction of the cooperative's management, the Court declined to "decide how far § 1962(c) extends down the ladder of operation." Id. at 184 n.9, 113 S. Ct. at 1173 n.9.

Gage argues that he was merely "an independent purchaser who was buying from whomever . . . [and that] he had no power to direct the affairs of the enterprise." (Gage's brief at page 20) He argues that the evidence is insufficient to support his conviction under § 1962(c) because Reves requires evidence that he exhibited "decision-making" power, such as the power to "set prices or schedule delivery dates and times." Id. Although such evidence would certainly be relevant to show that a defendant participated in the operation of an enterprise, Reves does not require it. Reves only requires that a defendant "take part in" the operation of the enterprise, not that he direct its affairs. Moreover, unlike Reves, which involved a defendant with a "horizontal" connection to the enterprise, this case presents the "vertical" question of how far RICO liability may extend "down the organizational ladder." See United States v. Oreto, 37 F.3d 739, 750 (1st Cir. 1994).

In a multiple-level, international drug enterprise such as the Samuel Posada-Rios organization, the success of the enterprise depends upon many people who participate in the affairs of the enterprise at different levels, from the boss in Colombia through multiple levels of distributors to the retail dealers who sell to the ultimate users. Gage was a mid-level distributor; he bought

multiple-kilogram loads of cocaine from Cortes and paid large sums of money to the enterprise. Although he did not operate the enterprise as a whole, he participated in its operation at his level by deciding how much cocaine to buy and what prices and terms to charge to the lower-level distributors to whom he redistributed the cocaine.

In United States v. Cauble, 706 F.2d 1322 (5th Cir. 1983), we held that a defendant does not "conduct" or "participate in the conduct of an enterprise's affairs" unless (1) the defendant has in fact committed the racketeering acts as alleged, (2) the defendant's position in the enterprise facilitated his commission of the racketeering acts, and (3) the predicate acts had some effect on the enterprise. Id. at 1332-33. The government's evidence against Gage established each of these elements.

The enterprise was the Samuel Posada-Rios organization, a group of people who distributed and redistributed large amounts of cocaine over an extended period of time for profit. There was evidence at trial to support the jury's verdict that Gage committed racketeering acts Nos. 131A (count 3) and 145 (count 5) by conspiring to possess cocaine with intent to distribute it and by possessing with intent to distribute 14 kilograms of cocaine in August of 1991. It was also reasonable for the jury to conclude that Gage's position in the Posada-Rios organization facilitated the commission of his racketeering acts because the Posada-Rios organization made large supplies of cocaine from the enterprise

-45-

available to Gage on a regular basis.  Likewise, the jury could have reasonably concluded that Gage's racketeering acts affected the enterprise because his willingness to purchase multiple-kilogram amounts of cocaine on a regular basis for hundreds of thousands of dollars enhanced the continued economic viability of the enterprise.  See Cauble, 706 F.2d at 1341.  Without attempting to define the limits of vertical RICO liability after Reves, we are persuaded that the evidence against Gage was sufficient to support his § 1962(c) conviction under both Reves and Cauble.

2.  RICO Conspiracy, 18 U.S.C. § 1962(d)

Title 18 § 1962(d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Mena, Murga, Varon, Parada, and Gage argue that the direction and control requirements of Reves also apply to a RICO conspiracy charge.  This is an issue of first impression in this circuit.  To date five circuit courts have addressed whether the management and control test set forth in Reves applies to a RICO conspiracy.  The Second, Seventh, and Eleventh Circuits have held that Reves' management and control test does not apply to a RICO conspiracy, concluding that "Reves addressed only the extent of conduct or participation necessary to violate a substantive provision of the statute; the holding in that case did not address the principles of conspiracy law undergirding § 1962(d)."  United States v. Quintanilla, 2 F.3d 1469, 1484-85 (7th Cir. 1993); accord United States v. Starrett, 55 F.3d 1525,

-46-

1547 (11th Cir. 1995), <u>cert.</u> <u>denied</u>, 517 U.S. 111, 116 S. Ct. 1335 (1996); <u>Napoli v. United States</u>, 45 F.3d 680, 683-84 (2d Cir. 1995).  The Third and Ninth Circuits, however, have held that <u>Reves</u>' management and control test must necessarily apply to a RICO conspiracy because to hold otherwise would render <u>Reves</u> nugatory. <u>See</u> <u>Neibel v. Trans World Assurance Co.</u>, 108 F.3d 1123, 1128 (9th Cir. 1997); <u>United States v. Antar</u>, 53 F.3d 568, 581 (3d Cir. 1995).[10]

We conclude that the better-reasoned rule is the one adopted by the Second, Seventh, and Eleventh Circuits, especially in light of the Supreme Court's recent decision in <u>Salinas v. United States</u>, 522 U.S. 52, 118 S. Ct. 469 (1997), which affirmed this court's decision in <u>United States v. Marmolejo</u>, 89 F.3d 1185 (5th Cir. 1996).  In <u>Salinas</u> the petitioner argued that to convict a defendant of conspiring to violate RICO the government must prove that the defendant personally agreed to commit two predicate acts.  The Court disagreed, holding instead that § 1962(d) is governed by traditional conspiracy law.  The Court held that "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." <u>Salinas</u>, 118 S. Ct. at 477.

To prove a RICO conspiracy the government must establish (1) that two or more people agreed to commit a substantive RICO

---

[10]The D.C. Circuit has recognized the split but declined to resolve the issue because it concluded that the defendant would have been convicted regardless of the approach adopted by the court.  <u>See</u> <u>United States v. Thomas</u>, 114 F.3d 228, 242-43 (D.C. Cir.), <u>cert.</u> <u>denied</u>, --- U.S. ---, 118 S. Ct. 635 (1997).

-47-

offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense. See Marmolejo, 89 F.3d at 1196-97. The government is not required to prove a conspiracy through direct evidence. Because conspirators normally attempt to conceal their conduct, the elements of a conspiracy offense may be established solely by circumstantial evidence. See United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1988). "The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collocation of circumstances.'" United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992) (quoting United States v. Lentz, 823 F.2d 867, 868 (5th Cir. 1987)). Although a defendant's mere presence at the scene of a crime is not, by itself, sufficient to support a finding that the defendant is participating in a conspiracy, presence and association may be considered by the jury along with other evidence in finding that the defendant participated in a conspiracy. See United States v. Chavez, 947 F.2d 742, 745 (5th Cir. 1991).

Moreover, a defendant may be convicted of a conspiracy if the evidence shows that he only participated at one level of the conspiracy charged in the indictment, and only played a minor role in the conspiracy. See United States v. Prieto-Tejas, 779 F.2d 1098, 1103 (5th Cir. 1986). The government does not have to prove that the defendant knew all of the details of the unlawful enterprise or the number or identities of all of the co-conspirators, as long as there is evidence from which the jury could reasonably infer that the defendant knowingly participated in

some manner in the overall objective of the conspiracy. See United States v. Fernandez-Roque, 703 F.2d 808, 814-815 (5th Cir. 1983). A defendant may not, however, be convicted of a drug conspiracy merely by evidence that he associated with other drug conspirators or by evidence that places the defendant in "a climate of activity that reeks of something foul." Maltos, 985 F.2d at 746 (quoting United States v. Galvan, 693 F.2d 417, 419 (5th Cir. 1982)).

a. Mena

The government attempts to link Mena with the Samuel Posada-Rios drug conspiracy through Wonda Cortes's testimony that she flew to Los Angeles in November of 1991 and negotiated with Mena for several months to obtain cocaine from a source of supply other than the Posada-Rios enterprise. It is undisputed, however, that nothing ever materialized from these negotiations. According to the government, by negotiating with Wonda Cortes, Mena should have acquired at least a rough idea of the larger scheme. Although the government correctly points out that parallel or multiple sources of drugs do not destroy the existence of a single conspiracy, see United States v. Johnson, 54 F.3d 1150, 1154 (4th Cir. 1995), the government must nevertheless establish that Mena was involved in the conspiracy charged in the indictment. The government also argues that since Mena had a longstanding association with both the drug trade and with various members of the Posada-Rios enterprise, the jury was entitled to infer that he knew that the prospective act of supplying cocaine to Wonda Cortes would entail numerous violations of the law. That is no doubt true and supports, in

part, Mena's conviction on count 3. But even accepting every reasonable inference, there is no evidence that Mena knew of and agreed to participate in the Posada-Rios RICO conspiracy charged in count 1. Although we agree that a conspirator need not know each of his co-conspirators, or the details of the conspiracy, the government's theory in this case stretches too far the outer bounds of RICO conspiracy law. We conclude that the evidence was not sufficient to support Mena's conviction on count 1.[11]

Although we vacate Mena's conviction and sentence on count 1, we do not remand for resentencing. In calculating Mena's offense level, counts 1, 3, 42, and 43 were grouped together. Because count 3 had the highest level, it became the offense level for all four counts. Mena's total offense level on these four counts was 36. With a criminal history category of II, his guideline range was 210-262 months. Because of a prior Texas felony drug conviction, however, Mena was subject to the statutory minimum sentence of 240 months under 21 U.S.C. § 841(b)(1) for

---

[11]When questioned at oral argument about the weak evidentiary support for Mena's RICO conspiracy conviction, the government argued that the conviction was sustainable under the court's analysis in United States v. Elliott, 571 F.2d 880 (5th Cir. 1978). Having carefully considered Elliott we are not persuaded that it can shoulder the load the government assigns it. Although Elliott recognized the well-established rules that "under the RICO conspiracy provision, remote associates of an enterprise may be convicted as conspirators on the basis of purely circumstantial evidence" and that the "government is not required to prove that a conspirator had full knowledge of all the details of the conspiracy," the court also acknowledged the equally well-established principle that the defendant must nevertheless have "knowledge of the essential nature of the plan." Id. at 903 (citations omitted). In this case Mena's unsuccessful negotiations with Wonda Cortes are inadequate to show that Mena was aware of the Samuel Posada-Rios drug distribution enterprise.

counts 1, 3, 42, and 43, which was the sentence he received. (See Part III.G.2., infra.) Where, as here, Mena's sentence on counts 3, 42, and 43 was no harsher than it would have been with his conviction for count 1 there is no need to remand for resentencing. See United States v. Narviz-Guerra, 148 F.3d 530, 534 (5th Cir. 1998); United States v. Michel, 588 F.2d 986, 1001 (5th Cir. 1979).

b. Murga

Relying on her acquittal on count 2, the substantive RICO charge, Murga first argues that there was insufficient evidence to support her RICO conspiracy conviction because a RICO conspiracy requires proof that she committed two overt acts in furtherance of the conspiracy. As we explained above this argument was rejected by this court in Marmolejo and by the Supreme Court in Salinas.

Murga next argues that there was no direct evidence linking her to any of the drugs or money involved in the conspiracy. We are not persuaded by this argument because as detailed in Part I.C., supra, of this opinion, the government presented ample evidence that in 1988 and again in 1991 Murga assisted her ex-husband, Ariel Ochoa, in distributing multiple-kilogram loads of cocaine for the Samuel Posada-Rios organization. Because the evidence was sufficient to establish that Murga knew of and agreed to the overall objective of the RICO conspiracy, the evidence was sufficient to sustain her RICO conspiracy conviction.

c. Varon

Varon argues that she was merely "assisting Cortes in selling, delivering and protecting the drugs" and that "[s]he did not set prices or schedule the delivery dates and times." (Varon's brief at page 15)  The record, however, does not corroborate such a limited role for Varon.  There was evidence that Varon persuaded Wonda Cortes to sell cocaine to her sister, Janeth Varon, and to Olivia Alastre, with Carmenza Varon and Alastre agreeing to split the proceeds for the sale of the cocaine.  Varon also guarded Wonda Cortes's cocaine, accompanied Cortes on cocaine deliveries, and assisted Cortes in counting the proceeds of the cocaine sales on November 15 and 16, 1991.  The evidence was sufficient for the jury to conclude that Varon knew of and agreed to the overall objective of the RICO conspiracy.

### d.  Parada

Parada argues that he was hired by Harold Cortes merely to run errands.  Although he acknowledges that he performed services for Harold Cortes and that he was paid with drug proceeds by Harold Cortes, he argues that he was shielded from any knowledge that Harold Cortes and Hernan Moreno were engaging in drug trafficking.  He argues that the services he performed were capable of innocent explanation, i.e., he leased the apartments where Moreno lived because he had good credit and spoke better English, and he did not know that the car he transported was altered for smuggling.

Our review of the evidence discussed in Part I.D.1, supra, does not support such a benign role for Parada.  Parada's claim of ignorance is inconsistent with his post-arrest statement in which

-52-

he acknowledged that he knew that his cohorts were "up to no good." Likewise, Parada's claim of ignorance overlooks the fact that he continued his association with Harold Cortes and Moreno even after he was stopped by the Louisiana Highway Patrol in May of 1991 and after the July 1991 seizure of money from Victor Loaiza. Moreover, evidence that Parada rented apartments under false names and allowed members of the enterprise to use his address to register pagers is probative of his knowledge of the conspiracy and intent to act in furtherance of it. See United States v. Quiroz-Hernandez, 48 F.3d 858, 868 (5th Cir. 1995). Although many of the facts of Parada's involvement with the conspiracy, when viewed in isolation, may be explainable, when viewed together in light of the other evidence, the jury could have reasonably concluded that Parada knew of and agreed to the overall objective of the conspiracy.

### e. Gage

The evidence established that between August and December of 1991 Gage purchased large amounts of cocaine from Wonda Cortes for redistribution. Although Gage is correct that a buyer-seller relationship, by itself, is insufficient to show conspiratorial activity, the government also presented evidence that Gage purchased some of the cocaine on consignment, which is "strong evidence" of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship. See United States v. Rodriquez, 53 F.3d 1439, 1445

(7th Cir. 1995).  A rational jury could have concluded that Gage knew of and agreed to the overall objective of the conspiracy.

3.  The Controlled Substances Violations

To prove a drug conspiracy in violation of 21 U.S.C. §§ 841 and 846 the government must establish:  "(1) the existence of an agreement between two or more persons [to violate the narcotics laws]; (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the conspiracy."  United States v. Thomas, 120 F.3d 564, 569 (5th Cir. 1997), cert. denied, --- U.S. ---, 118 S. Ct. 721 (1998) (quoting United States v. Brown, 29 F.3d 953, 958 (5th Cir. 1994)).

To convict a defendant of possession of an illegal drug with intent to distribute in violation of 21 U.S.C. § 841(a), the government must establish that the defendant (1) knowingly (2) possessed a controlled substance (3) with intent to distribute it.  See id.

To convict a defendant of aiding and abetting the possession of a controlled substance with intent to distribute it the government must establish that the defendant (1) associated with the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed.  See United States v. Lombardi, 138 F.3d 559, 561 (5th Cir. 1998).  In addition, the defendant must share the intent to commit the crime and must play an active role in its commission.  Id.

a.  Mena

-54-

Although we have concluded that the evidence was not sufficient to support Mena's RICO conspiracy conviction under count 1, we are satisfied that Mena's conviction for conspiracy to possess cocaine with intent to distribute as charged in count 3 of the indictment is supported by the evidence discussed in Part I.G., supra.[12]

b. Murga

In her brief Murga offers no real analysis of the evidence of guilt on these counts and concedes that this is her weakest argument. Our review of the evidence against Murga summarized in Part I.C., supra, satisfies us that the jury had sufficient evidence to convict her of counts 3 and 41.

c. Gamboa

Gamboa was not charged in counts 1-3 of the indictment; he was charged and convicted of count 42 for a separate conspiracy with Mena to distribute cocaine and of count 43 for aiding and abetting the underlying substantive offense. Gamboa argues that, at best, the evidence only established that he associated with people engaged in a conspiracy and that he was in "a climate of activity that reeks of something foul," see Maltos, 985 F.2d at 746, and he attempts to compare the facts of his case to those of other cases in which the defendants' convictions were reversed on appeal for insufficient evidence. Drug cases are fact specific.

---

[12]Mena does not challenge his conviction on counts 42 and 43, which charged him with a narrower drug conspiracy and with cocaine possession relating to his August 1992 drug deal with Raul Gamboa.

Gamboa's testimony denying that he was present at the Giro El Calima and denying any knowledge of the Nissan Maxima, coupled with the other evidence against him summarized in Part I.G., supra, was sufficient to sustain his convictions on counts 42 and 43. See Thomas, 120 F.3d at 570 (false statements by a defendant are evidence of guilty knowledge).

### d. Parada

Our discussion above of the evidence that supports Parada's conviction for conspiring to violate RICO satisfies us that the evidence was also sufficient to sustain his conviction on count 3 for conspiracy to possess cocaine with intent to distribute it in violation of 21 U.S.C. §§ 841(a) and 846.

### e. Gage

Gage argues that because the jury acquitted him on counts 6 and 21, which were based primarily on the testimony of Wonda Cortes, the jury's guilty verdicts on counts 3 and 5 were inconsistent and based on confusion. We reject this argument because inconsistent verdicts do not impact the court's sufficiency of the evidence analysis. See United States v. Parks, 68 F.3d 860, 865 (5th Cir. 1995), cert. denied, 516 U.S. 1098, 116 S. Ct. 825 (1996). It was within the jury's discretion to disregard Cortes's testimony in some respects and accept it in other respects. Gage also argues that there was no corroborating surveillance of his meetings with Wonda Cortes. It is well settled, however, that a

conviction may rest solely upon the uncorroborated testimony of an accomplice, even one who has chosen to cooperate with the government in exchange for leniency, as long as the testimony is not insubstantial on its face.  See United States v. Rasco, 123 F.3d 222, 228 (5th Cir. 1997), cert. denied, --- U.S. ---, 118 S. Ct. 868 (1998).  Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature.  See United States v. Bermea, 30 F.3d 1539, 1552 (5th Cir. 1994).  Wonda Cortes's testimony is not susceptible to either vice.  We have considered Gage's other factual sufficiency arguments and are not persuaded by them.  There was ample evidence that Gage conspired with other defendants to possess cocaine with the intent to distribute it, as charged in count 3, and that he possessed 14 kilograms of cocaine in August of 1991 with the intent to distribute it, as charged in count 5.

4. Jackquet's conviction for use of a firearm "during and in relation to" a drug trafficking offense in violation of 18 U.S.C. § 924(c)

Count 52 of the superseding indictment charged Jackquet with using and carrying a 12-gauge shotgun on August 13, 1992, "during and in relation to the drug trafficking crime charged in Count Three . . . ."  The district court instructed the jury on both the "use" and "carry" prongs of § 924(c).  Jackquet argues that the evidence was not sufficient to show that he "used" a firearm within the meaning of Bailey v. United States, 516 U.S. 137, 116 S. Ct.

-57-

501 (1995), or that he used a firearm "in relation to" a drug trafficking offense.

The first argument clearly has no merit. The evidence showed that Jackquet used the shotgun to shoot DPS officer Larry Allen to avoid being arrested. As the Supreme Court explained in Bailey "using" a firearm includes "brandishing, displaying, . . . and most obviously, firing or attempting to fire, a firearm." Id. at 148, 116 S. Ct. at 508. Jackquet's conduct meets Bailey's definition of use.

Jackquet's argument that his use was not "during and in relation to" a drug trafficking offense is based on the fact that his arrest on August 13, 1992, occurred six months after the last specific drug trafficking transaction with Wonda Cortes. In United States v. Tolliver, 116 F.3d 120, 125 (5th Cir.), cert. denied, --- U.S. ---, 118 S. Ct. 324 (1997), the court explained that "[t]he phrase 'in relation to' . . . requires only that the firearm have played a role in the crime for which the defendant is charged; the firearm cannot have been inadvertently used or carried 'in relation to' an obviously unrelated crime." In Tolliver defendant Shane Sterling was convicted under § 924(c) based on evidence that he reached for a loaded pistol as federal agents entered his bedroom to arrest him on drug charges. On appeal Sterling argued that he did not use the pistol "in relation to" the underlying drug conspiracy because his use of the pistol related only to "the assault of a federal officer," not the underlying drug offense. Id. at 125. This court disagreed, concluding that his use of the pistol "had the potential to facilitate the drug distribution

-58-

conspiracy for which Sterling is charged." Id. at 126. The court concluded that "Sterling's use of the gun was 'in relation to' the underlying drug conspiracy; such use could have facilitated that conspiracy by preventing the arrest of two conspirators and forestalling the seizure of various instrumentalities of the conspiracy." Id. In this case we likewise conclude that Jackquet's use of the shotgun to avoid arrest on drug charges provided a sufficient factual basis for the jury to conclude that he used the gun in relation to the underlying drug conspiracy.

5. Murga's conviction for making a false statement on a visa application in violation of 18 U.S.C. § 1546(a)

Murga challenges the sufficiency of the evidence to support her conviction on count 48 for knowingly making a false statement on a visa application that she signed on March 9, 1992, at the American Embassy in Bogota, Colombia. Question 33.B on the application asked whether "you are an alien who is or has been a trafficker in any controlled substance." Murga answered "no" to the question, and the United States issued her a visa based on the application. The jury heard evidence, summarized in Part I.C., supra, that Murga delivered a 25-kilogram load of cocaine and a 75-kilogram load of cocaine to Esnoraldo Posada-Rios in 1988 at the direction of Ariel Ochoa and that Murga sold cocaine to Jose Antonio Ortiz in 1989.[13] We have considered all of Murga's

---

[13]In her reply brief Murga argues that the government did not "rely" on this evidence at trial to establish her guilt on count 48. The record contradicts this argument. At vol. 113, pages 9107 to 9110 of the Trial Transcript the government argued that this very evidence established Murga's guilt on count 48.

arguments and are satisfied that there was sufficient evidence for the jury to convict her of count 48.[14]

**B.      Joinder and Severance Issues**

1.  Joinder

Mena and Gamboa argue that they were improperly joined in the superseding indictment.  Under Fed. R. Crim. P. 8(b) the initial joinder of defendants is proper "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Defendants who are charged with conspiring together are properly joined in a single indictment.  See Moser, 123 F.3d at 828. Whether joinder is proper is normally determined from the allegations in the indictment.  See United States v. Faulkner, 17 F.3d 745, 758 (5th Cir. 1994).

Because Mena was charged with both the RICO and drug distribution conspiracies (counts 1 and 3), his joinder in the indictment with his alleged co-conspirator was proper under Rule

---

[14]Murga argues that the district court erred in excluding from evidence a letter from a Texas judge to the Colombian consul stating that she had been acquitted of state drug charges arising out of her delivery of 40 kilograms of cocaine on June 14, 1989. The district court did not err in excluding the letter under Fed. R. Evid. 403 because the question for the jury was whether Murga had falsely denied prior drug trafficking in her visa application, not whether she had falsely denied a prior drug conviction.  We have held that "evidence of a prior acquittal is not relevant because it does not prove innocence but rather merely indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime." United States v. Kerley, 643 F.2d 299, 300-301 (5th Cir. Unit B April 1981).  For the same reasons we also conclude that the district court did not err in refusing Murga's proposed jury instruction that the jury could not consider her participation in the events of June 14, 1989, in its consideration of count 48.

8(b). Gamboa, however, was not charged in either of those conspir-acies. He was charged in count 42 with conspiring with Mena to possess with intent to distribute cocaine and in count 43 with possession with intent to distribute cocaine. Gamboa argues that the only "common denominator" between him and the other defendants was Mena. "Joinder of charges is the rule rather than the excep-tion and Rule 8 is construed liberally in favor of initial joinder." United States v. Bullock, 71 F.3d 171, 174 (5th Cir. 1995), cert. denied, 517 U.S. 1126, 116 S. Ct. 1365 (1996). Although the question is a close one, we are satisfied that the initial joinder of the subsidiary conspiracy charged in count 42 and of the substantive cocaine possession charged in count 43 with the other counts of the superseding indictment was proper. The conspiracies charged were not separate or distinct; they were substantially interrelated by their facts and common aims (importation and distribution of large amounts of Colombian cocaine) and by at least one common participant (Mena). See United States v. Kaufman, 858 F.2d 994, 1003 (5th Cir. 1988).

2. Severance

Varon, Parada, and Gage join Mena and Gamboa in arguing that the district court abused its discretion by denying their motions to sever under Fed. R. Crim. P. 14 before trial and at various times during the trial and by denying their motions for new trial based on alleged prejudice to them from the joint trial. This court reviews a district court's denial of a motion to sever for an abuse of discretion. Bullock, 71 F.3d at 174. Even in cases where

the initial joinder of defendants was not proper, to demonstrate reversible error from the denial of a motion for severance a defendant must still show "clear, specific and compelling prejudice that resulted in an unfair trial." Id. The general rule is that "'persons indicted together should be tried together, especially in conspiracy cases, and . . . the mere presence of a spillover effect does not ordinarily warrant severance. . . .'" Moser, 123 F.3d at 828 (quoting United States v. Pofahl, 990 F.2d 1456, 1483 (5th Cir. 1993)). That separate trials might have afforded the defendant "a better chance of acquittal" does not justify a severance. Id. at 828. The possibility of prejudice must also be balanced against the interest of judicial economy. See United States v. Wolford, 614 F.2d 516, 518 (5th Cir. 1980). A defendant complaining of the denial of a motion to sever must also show that he did not receive adequate protection from the potential prejudice of a joint trial through the court's instructions to the jury. See United States v. Mitchell, 31 F.3d 271, 276 (5th Cir. 1994).

Appellants advance both common and individual arguments to show that they were prejudiced by the joint trial. Generally, they argue that they were prejudiced by evidence of crimes committed by co-conspirators, including gruesome murders, before they joined the conspiracies. As the court noted in United States v. Manges, 110 F.3d 1162, 1174-75 (5th Cir. 1997), cert. denied, --- U.S. ---, 118 S. Ct. 1675 (1998), however, "[w]hile the district court must guard against undue prejudice, it need not protect conspirators from

evidence of their confederates' acts in furtherance of their common illegal aim."

Appellants also argue that they were prejudiced by the length of the trial (six months) and the number of defendants tried together (twelve), and by the tense atmosphere created by the high security required for this trial. This court has rejected the notion that the length of trial or number of defendants or the atmosphere of a "megatrial" alone can establish the compelling prejudice required for reversal based on the denial of a motion to sever. In United States v. Ellender, 947 F.2d 748, 755 (5th Cir. 1991), the court acknowledged that there are legitimate concerns over megatrials (in that case, 23 defendants tried over 3 months), but concluded that "[m]ere generalized criticism of megatrials generally will not withstand the rigorous standard of review for denial of severance." Id. Instead, appellants must "isolate events occurring in the course of a joint trial and then . . . demonstrate that such events caused substantial prejudice." Id.

In this case the district court took a number of steps to lessen the prejudice to individual defendants from a joint trial. During the voir dire examination of the jury panel, and again before any evidence was offered, the court told the jury that the case against each individual defendant should be considered separately. The court also allowed the jurors to take notes and to have photographs of the defendants to enable the jurors to keep the defendants separate in their minds. In Ellender we concluded that

the defendants had not demonstrated compelling prejudice in part

because "the jurors were provided with a copy of the final

indictment, a seating chart, and note-taking materials."  947 F.2d

at 755.

In its charge to the jury, the district court instructed:

> A separate crime is charged against one or more of
> the defendants in each count of the Indictment.  Each
> count, and the evidence pertaining to it, should be
> considered separately.   Also, the case of each
> defendant should be considered separately and
> individually.  The fact that you may find one or more
> of the defendants guilty or not guilty of the crimes
> charged should not control your verdict as to any
> other crime or any other defendant.  You must give
> separate consideration to the evidence against each
> defendant.  (Court's Instructions to the Jury at page
> 19)

Similar instructions have been held to be sufficient to cure the

possibility of prejudice because the court presumes that the jury

followed the court's instructions.  See, e.g., Faulkner, 17 F.3d at

759.

The district court also instructed the jury many times during

the trial to consider certain evidence only against certain

defendants and to consider other evidence only for limited

purposes.   For example, with respect to Gamboa, who has the

strongest severance argument since less than 2 days of evidence

related to him, the district court instructed the jury:

> Ladies and Gentlemen, you are instructed that the
> evidence of this witness and the evidence of the
> witnesses you have already heard, the monitor
> witnesses, and the evidence that I have admitted in
> the case up until now has not been offered by the
> government for your consideration against Mr. Gamboa,
> the Defendant Mr. Gamboa.   The government has
> indicated that the charges against Mr. Gamboa, the
> accusations against him refer to a specific date,

August 11, 1992.  So until further notice, none of the evidence, until I tell you that the government is going to offer evidence now concerning Mr. Gamboa, none of the evidence is against Mr. Gamboa, is being offered by the government for your consideration against Mr. Gamboa.  (Trial Transcript, vol. 70, pages 1551-1552)

When the government later began presenting evidence against Gamboa the court reminded the jury that none of the evidence presented thus far related to Gamboa, but that the government would now be offering evidence against Gamboa.  (Trial Transcript, vol. 89, page 4936)

In this case the presumption that the jury followed the court's instructions is even stronger in light of the jury's verdicts.  The jury acquitted Murga of count 2; acquitted Varon of counts 6, 21, and 25; acquitted Jackquet of count 6; acquitted Watson of count 6; and acquitted Gage of counts 6 and 21.  "[A]cquittals as to some defendants on some counts support an inference that the jury sorted through the evidence and considered each defendant and each count separately."  Ellender, 947 F.2d at 755.[15]

Defendants also raise various individual arguments in support of their severance points.  Gamboa argues that the government's

---

[15]Varon and Gage argue that the mixed verdicts demonstrates juror confusion because the government's case against them was supported by the testimony of the same two witnesses (Wonda Cortes and Hall).  That the jury acquitted defendants of some charges based on the testimony of Cortes and Hall, but convicted them of other charges based on the testimony of the same witnesses does not necessarily demonstrate juror confusion:  The testimony may have been more believable with respect to some counts than others.  The jury was apparently quite able to separate the wheat from the chaff.

case against him was weak and that he was prejudiced by being pictured on a large chart along with all of the defendants. But the evidence relating to Gamboa's activities on August 11, 1992, was not weak, and those events were separated in time and place from the evidence against other defendants, thereby lessening any possible spillover effects from the evidence against other defendants. Likewise, although Gamboa's face on the photo chart was constantly before the jury, the only relationship noted between him and any of the other defendants on the chart was a horizontal dotted line between Gamboa and Mena.

Gage argues that he was prejudiced by the joint trial because his brother Jackquet pleaded guilty to count 27. The plea occurred after three days of voir dire examination of the jury panel and outside of their presence. After the jury was sworn the government arraigned the defendants in open court, and Jackquet pled guilty to count 27 and not guilty to the other counts against him. Any risk of prejudice to Gage from Jackquet's guilty plea to count 27 was remote. Only Jackquet was charged with count 27 (possession with intent to distribute cocaine on or about October 10, 1991), and no evidence was offered about Wonda Cortes's sales of cocaine on December 10 and 11, 1991, until several weeks later during the trial.

Parada argues that a juror acceptable to him was stricken for cause at Jackquet's behest because of his apparent inability to be fair to a defendant charged with shooting a police officer. Parada provides no support for his assertion that this was a "fundamental

error" that requires a reversal. Parada also argues that the joint trial resulted in a violation of his right to a speedy trial. Although Parada might have been able to raise a separate speedy trial claim, this is not the type of prejudice that requires reversal under a severance analysis. Parada also argues that an incident in which codefendant Watson's brother accosted a juror constitutes prejudice flowing from the joint trial. This incident, raised in separate points of error by Parada and other defendants and discussed separately below, does not show compelling prejudice from the joint trial.

We have carefully considered all of the appellants' severance arguments. A long and complex trial like this one taxes the patience and vigor of the judge, jury, and counsel. The record discloses very few instances of antagonistic arguments or evidence among defense counsel. The government's evidence was focused, and the testimony of witnesses was directed to particular defendants and counts. The district judge ably parsed through the almost daily arguments of counsel over evidentiary and procedural issues in order to assure a fair trial for all parties and to minimize any spillover effect from the long joint trial. None of the defendants' arguments persuade us that the district court erred in denying appellants' motions to sever or their motions for new trial based on the alleged prejudice of a joint trial.

## C.    Evidentiary Issues

1.  Admissibility of Watson's Statements

Watson filed a motion to suppress statements made to law enforcement officers after her arrest.  After an evidentiary hearing the court entered an order on March 29, 1993, denying the motion to suppress.  The order stated

> The Court finds that on August 13, 1992, law enforcement officers entered the residence at 4801 Meadow Park, Houston, with Defendant Mona Smith Watson's permission, read Defendant her rights, lawfully took Defendant into custody pursuant to an arrest warrant, and searched the home of her mother, Marion Smith, following consent from Defendant with her mother's authorization.  Credible testimony from DEA agent Roger Norman, ATF agent  Mary Daugherty, and Harris County Sheriff's Department's Butch Porter convinces the Court that Defendant did not ask for an attorney nor request her mother to call an attorney for her at this time.
>
> . . . Defendant's voice exemplar tape fortuitously and clearly shows that during her post-arrest questioning by Butch Porter at the [DEA building], Defendant Mona Smith Watson failed to assert, even equivocally, her right to have an attorney present or to stop the questioning. [citations omitted]  Porter did not pressure her, but gave her free choice whether to call an attorney or stop the interview. Defendant orally and in writing voluntarily and knowingly waived her rights to do so.  Moreover FBI agent Bobby Echard credibly testified that Defendant was fully cooperative during her interview and did not request a call to anyone other than her mother.  Moreover Defendant voluntarily signed a consent form for the search of her apartment.
>
> The Court did not find believable the testimony of Marion Smith, whose credibility was undermined by questioning about her job, income, false credit statement for the purchase of a Jaguar, and the car itself.
>
> All testimony showed that at the time of her arrest and subsequent processing and interview at the [DEA building], Defendant was in complete control of her senses, not under the influence of drugs, coherent, able to understand, and fully apprised of her rights.  This and other appearances before this Court have revealed her to be an intelligent and sophisticated business woman, who supervised eight employees and dealt extensively with the public.  The Court finds that she was not intimidated or misled

during the post-arrest processing, nor did she request interruption of the questioning. The Court does not find convincing her testimony that she was relying on the advice and help of her sister's friend, Butch Porter, of agent Bobby Echard, and of interviewer Joe Harris in her cooperation with the authorities.

The district court also instructed the jury that it must determine whether an out-of-court statement by a defendant was knowingly and voluntarily made. (Court's Instructions to the Jury at pages 7 and 8)

Watson raises three challenges to the admissibility of her confession. First, she contends that the confession was involuntary under the Fifth Amendment because it was the result of a "false friend" interrogation condemned by the Supreme Court in Spano v. New York, 360 U.S. 315, 79 S. Ct. 1202 (1959). She also contends that her confession violated her Fifth Amendment right to counsel because it occurred after the interrogating agents were aware that she wanted counsel, and that it violated her Sixth Amendment right to counsel because it occurred after she had been indicted, but had not waived her right to counsel.

A confession is voluntary if under all the circumstances it is the product of the defendant's free and rational choice. See United States v. Restrepo, 994 F.2d 173, 182 (5th Cir. 1993). The voluntariness of a statement is reviewed on a case-by-case basis. Findings of the district court after an evidentiary hearing, including credibility choices made by the district court, are reviewed by this court under a clearly erroneous standard. Id. The ultimate issue of voluntariness, however, is a question of law subject to de novo review by this court.

Watson's claim that her confession was involuntary because it was the result of a "false friend" interrogation is based on the fact that the police used deputy Porter, a friend of Watson's sister, to fingerprint, photograph, and interview her for a DEA "personal history." Deputy Porter, who was not involved in the investigation of this case, was also present at Watson's arrest and the search of her house. The facts of this case do not approach those in Spano, where the government used a longtime friend of the accused to coerce a confession. Spano had called his friend, officer Bruno, and told him about the events that led up to the shooting for which he was arrested. See Spano, 360 U.S. at 316, 79 S. Ct. at 1204. After Spano repeatedly refused, on advice of counsel, to answer questions from an assistant district attorney and police detectives, Bruno's supervisors coached Bruno to tell Spano that his telephone call had "gotten him 'in a lot of trouble,'" and that Spano should think of Bruno's wife and three children. Id. at 319, 79 S. Ct. at 1205. Bruno pleaded with Spano at least four times before he confessed.

In contrast, deputy Porter told Watson that he could not tell her what to do. He also informed her of her right to an attorney. Although he told her that another friend, detective Joe Harris, would be conducting the interrogation, a female FBI agent actually conducted the interrogation. The fact that deputy Porter exhibited sympathy and created an atmosphere of trust does not demonstrate the type of police overreaching prohibited by Spano. See United States v. Rojas-Martinez, 968 F.2d 415, 418 (5th Cir. 1992) ("Expressions of sympathy by an officer are not coercive.").

Watson was allowed to call her mother, the only person she asked to call. Watson never asked to terminate the interview, never requested counsel, and signed a written waiver of her rights. Although she testified at the suppression hearing that agents threatened that she would never see her daughter again, the district court found that this testimony was not credible.

Watson also argues that her confession was inadmissible under the Fifth and Sixth Amendments because it was obtained in violation of her right to counsel. Agent Norman testified that he read Watson her <u>Miranda</u> rights as soon as she was arrested and that she indicated that she understood those rights. This circuit has held that "[a]s long as the police administer <u>Miranda</u> warnings before proceeding, a defendant's voluntary decision to answer questions without claiming his right to have a lawyer present to advise him constitutes a 'knowing and intelligent,' and therefore valid, waiver of his Sixth Amendment right." <u>Montoya v. Collins</u>, 955 F.2d 279, 282 (5th Cir. 1992) (quoting <u>Patterson v. Illinois</u>, 487 U.S. 285, 292-97, 108 S. Ct. 2389, 2394-97 (1988)).

Watson acknowledges that "[t]he evidence was in dispute as to whether, where, and when [she] indicated that she wanted to contact counsel." (Watson's brief at 19) She appears to argue that she invoked her right to counsel at her mother's home when she was arrested, and that she gave another indication that she had not waived her right to counsel when she commented to deputy Porter

later at the DEA building that she "might have to get a lawyer then, huh?" in response to Porter's reiteration of her right to counsel.

In support of her argument that she invoked her right to counsel at her home Watson points to her mother's testimony that Watson asked her mother to contact Linda Jones so that Jones could contact an attorney who had represented her deceased son (and Watson's former boyfriend), Tony Jones. Watson testified that deputy Porter heard this request, and there was evidence that another officer wrote down Jones' telephone number for Watson's mother. The right to counsel must be "unambiguously" invoked. Davis v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994). Watson's statements to her mother, even if overheard by the officers, were insufficient to invoke her right to counsel. The arresting officers were not obligated to clarify whether her comments were intended to be an invocation of her right to counsel. See United States v. Scurlock, 52 F.3d 531, 537 (5th Cir. 1995). Watson's comment to deputy Porter that she "might have to get a lawyer then, huh?" was also insufficient to invoke her right to counsel. See Davis, 512 U.S. at 459, 114 S. Ct. at 2355 (holding that an arrestee's comment that "maybe [she] should talk to a lawyer" did not constitute an unambiguous request for counsel); Scurlock, 52 F.3d at 537 (holding that defendant's comment that she "needed a lawyer" was not a request for counsel when the comment was made in response to an agent's statement that she would be indicted in the future).

Fundamentally, these points of error express Watson's disagreement with the credibility choices made by the district court and the court's conclusions based on the evidence at the suppression hearing. Having carefully reviewed Watson's arguments and the record we are persuaded that none of the district court's findings are clearly erroneous and that Watson voluntarily consented to answer questions without the presence of counsel. Accordingly, we find no violation of Watson's Fifth or Sixth Amendment right.

2. Admissibility of Murga's Statements

After a two-day evidentiary hearing the district court entered a comprehensive, seven-page order denying Murga's motion to suppress her statements to law enforcement officers. In response to the district court's detailed findings of facts and conclusions of law regarding the voluntariness of Murga's confession and waiver of her <u>Miranda</u> rights, Murga states in her brief only that her "custodial statements were not truly voluntary because they resulted from improper inducements and continuing interrogation by numerous law enforcement officers and agents." (Murga's brief at 30 n.55) Murga's brief contains no argument or discussion of the facts explaining why the district court's findings were incorrect, and she does not even present an argument "as to what improper inducements were made." Although Murga cites documents filed in the district court by prior counsel, Murga cannot satisfy the requirements of Fed. R. App. P. 28(a)(5) by merely referring to

briefing filed with the district court.  We conclude that Murga has

waived this point of error because her brief fails to satisfy the

requirements of Fed. R. App. P. 28(a)(5) and (6).

3.  Admissibility of Evidence Seized from the Mercury Sable

Gamboa argues that the district court erred in denying his

motion to suppress evidence seized from a blue Mercury Sable on

August 11, 1992.  Gamboa first argues that he was illegally

detained in violation of Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868

(1968).  As explained in Part I.G., supra, the officers saw Gamboa

and Mena enter a suspected money laundering exchange, scanning the

parking lot as they went in.  The officers saw them leave the

exchange, again scanning the parking lot as they returned to their

car, with Gamboa carrying a heavy duffle bag, which he put into the

trunk of the car.  They then saw Mena use a cellular phone and saw

Gamboa and Mena engage in counter-surveillance techniques.[16]

Officers later saw Gamboa and Mena get into a blue Mercury Sable

and drive to another apartment complex.  The officers testified

that they approached Gamboa and Mena without drawing their weapons,

asked for identification, and told them that they were investigat-

ing drug trafficking activities.

---

[16]Use of counter-surveillance techniques by suspects raises a
reasonable suspicion.  See United States v. Quiroz-Hernandez, 48
F.3d 858, 863 (5th Cir. 1995).

-74-

In an order entered on April 1, 1993, the district court concluded that the investigating officers had reasonable suspicion of criminal activity to stop Gamboa. The district court also concluded that the government had proved by a preponderance of the evidence that Gamboa voluntarily consented to the officers' search of the Mercury Sable, both orally and in writing. Although Gamboa testified that the officers approached the car with their guns drawn and that he did not understand the consent form, the district court credited the officers' testimony that their weapons were not drawn when they approached the car, that officer Montalvo explained to Gamboa that he could refuse to consent to the search, and that Gamboa acknowledged that he understood him and executed a Spanish language consent form.

The district court was presented with two conflicting versions of the facts. Because the district court's factual findings are supported by the evidence, they are not clearly erroneous. See Amadeo v. Zant, 486 U.S. 214, 223, 108 S. Ct. 1771, 1778 (1988) (holding that where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous). Reviewing the evidence de novo, we also conclude that Gamboa has failed to establish a Fourth Amendment violation.

    4. Admissibility of Evidence Seized from Jackquet's Residence

Although Jackquet argues in his brief that the officers who arrested him failed to knock and announce their presence before entering his residence in violation of the Fourth Amendment, he never states that he objected to the admissibility of the evidence, either through a pretrial motion to suppress evidence or by objecting to evidence at trial.

Moreover, even had Jackquet objected to this evidence, he has failed to satisfy his initial burden of proving that "an unannounced entry actually occurred." Moser, 123 F.3d at 824 (quoting United States v. Fike, 82 F.3d 1315, 1323 (5th Cir.), cert. denied, 117 S. Ct. 241 (1996)). Jackquet argues that his statement to interrogating officers that he did not hear the arresting officers knock and announce before entering meets his initial burden. That statement, however, is not sufficient to make a prima facie showing under this court's analysis in United States v. Mueller, 902 F.2d 336 (5th Cir. 1990). In Mueller the court held that the defendant's affidavit, which stated that he had been asleep in a back bedroom of the house and had not heard the officers knock and announce, was too speculative to support the required initial showing, even in the absence of any testimony from the arresting officers that they knocked and announced before entering. Id. at 344. Jackquet's prima facie evidence is even weaker since the arresting officers testified that they knocked and repeatedly announced their presence before they entered Jackquet's residence. Jackquet has failed to show that the district court

committed plain error in admitting this evidence, see Moser, 123
F.3d 824, or assuming arguendo that he properly objected to it
before the trial court, that the court erred in admitting the
evidence.

    5.  The Government's Trial Charts

    Jackquet and Watson complain that the district court erred
in allowing the government to display throughout the trial time-
line and organizational charts.  The time line was posted on eight
large poster boards on easels.  The organizational chart arranged
photographs of the defendants in a manner that demonstrated the
government's theory of the defendants' roles in the conspiracies
and substantive RICO offenses.  Summaries of evidence and testimony
were attached to the time-line chart with Velcro as those items
were admitted into evidence.  The district court allowed the charts
to be used as demonstrative aids.  Since the charts were not
admitted in evidence, they were not sent to the jury room during
deliberations.

    Since the government did not offer the charts into evidence
and the trial court did not admit them, we need not decide whether,
as appellants argue, they were not admissible under Fed. R. Evid.
1006, which allows charts and summaries of "voluminous writings,
recordings, or photographs" to be received as evidence.  Where, as
here, the party using the charts does not offer them into evidence,
their use at trial is not governed by Fed. R. Evid. 1006.  See
Pierce v. Ramsey Winch Co., 753 F.2d 416, 431 (5th Cir. 1985).

We review the district court's decision to allow the government to display summary charts for abuse of discretion. See United States v. Winn, 948 F.2d 145, 158 (5th Cir. 1991). As the trial court explained in her memorandum and order allowing the use of the charts, the charts were not evidence but were "pedagogical" devices intended to present the government's version of the case. This court has held that the use of a chart as a demonstrative aid to summarize the evidence is permissible as long as the court gives the jury appropriate limiting instructions. See United States v. Torres, 114 F.3d 520, 526 (5th Cir.), cert. denied, 118 S. Ct. 316 (1997). In this case the district court instructed the jury that the charts were not evidence and that the summary was "just an effort to help you follow the evidence that you are going to be hearing over the course of the trial." The district court gave additional instructions during the trial that the charts were not evidence when asked to do so by defense counsel. We are satisfied that Fed. R. Evid. 611(a) afforded the district court discretion to allow the government to use the summary charts and organizational charts. The district court's rulings allowing the use of the charts, when accompanied by the court's repeated limiting instructions, was not an abuse of discretion.[17]

---

[17]Watson argues that the district court's charge to the jury failed to contain another limiting instruction about the charts. Watson does not argue, however, that she ever requested such an instruction. Although the charge did not reiterate the earlier limiting instructions about the charts, the charge did instruct the jury that "[i]t is your duty to base your verdict solely upon the
(continued...)

6. The Alleged Hearsay Testimony of Agent Schaefer

The government called Julio Jimenez a/k/a Victor Loaiza as a witness. On cross-examination by Parada's counsel Loaiza testified that Parada was not aware of the illegal activities of Ariel Ochoa, Harold Cortes, or Hernan Moreno. Loaiza testified that he and the other drug conspirators were careful not to let Parada in on the secrets of the drug business because "he was too sound a person, too straight of a person for that type of business." Loaiza also testified that Parada was not told about the hidden compartment in the car, and that all the errands Parada was asked to perform appeared on their surface to be legitimate. Loaiza also testified that he had told government agents that "Parada was not aware of what was going on." Later in the trial counsel for Parada cross-examined DEA agent Mike Schaefer about whether he participated in "the debriefing of [Loaiza] that took place over the last ten months where he said my client wasn't in the drug business." Agent Schaefer testified that he had participated in debriefing Loaiza.

The government then informed the court that agent Schaefer would be asked whether Loaiza had told Schaefer that Parada knew that Harold Cortes and Hernan Moreno were engaging in drug trafficking and money laundering. In response to Parada's hearsay

_____

(...continued)
testimony and evidence." (Court's Instructions to the Jury at page 2) Given this instruction and the court's repeated instructions during trial that the charts were not evidence, even if Watson had preserved this argument for appeal by requesting an appropriate instruction, the district court would not have erred in refusing it.

objection the government argued, and the district court agreed, that agent Schaefer's testimony about Loaiza's statements to him was relevant to refute the inference raised by Parada's counsel's questions to Loaiza and agent Schaefer that the government had acted in bad faith by prosecuting someone the government knew to be innocent. Before allowing the government to question agent Schaefer about Loaiza's statements the court gave the following instruction to the jury:

> Ladies and gentlemen, Mr. Lewis has indicated that he will elicit from Michael Schaefer, the witness on the stand, testimony concerning statements made to this witness by Victor Loaiza, also known as Julio Jimenez. These statements are not being offered for the truth of the matters asserted in Loaiza's statements to Mr. Schaefer, but, rather, are being offered to show that Loaiza made the statements to the investigating agents and to establish the effect on the agents in forming the bases of their subsequent conduct. (Trial Transcript, vol. 89, page 4919)

Agent Schaefer then testified that Loaiza had told him that "Parada knew that there was drug trafficking and money laundering going on by Hernan Moreno and Harold Cortes." Parada's counsel then cross-examined agent Schaefer at length about his interview with Loaiza.

Parada argues that the district court erred in allowing agent Schaefer to testify to Loaiza's hearsay statements and that the court's instruction was insufficient to prevent prejudice to Parada from this testimony. The district court's decision to allow this testimony is reversible only for abuse of discretion. See United States v. Carrillo, 20 F.3d 617, 619 (5th Cir. 1994). In light of the questioning by Parada's counsel, which made the testimony

relevant, and the limiting instruction given by the court, which minimized any unfair prejudice to Parada, the district court did not abuse its discretion in allowing Schaefer's testimony.

7.    Impeachment Evidence Against Agent Schaefer

Parada argues that the district court abused its discretion by refusing to allow him to introduce evidence that he claims would have impeached agent Schaefer's testimony. First, Parada complains that he was prevented from presenting evidence that agent Schaefer erroneously testified at Parada's pretrial detention hearing that pretrial services had told him that Parada was on probation in New York. Parada sought to present the testimony of Carolyn Baranowski, a pretrial services officer, that her files did not indicate that Parada was on probation as of the date of his arrest. The district court acted well within its discretion in excluding Schaefer's testimony from the pretrial detention hearing and Baranowski's testimony. See United States v. Hawkins, 661 F.2d 436, 444 (5th Cir. Unit B Nov. 1981) ("There is no right to impeach a witness with respect to collateral or irrelevant matters.").

Second, Parada complains that he was precluded from presenting evidence that Parada's son, mother, and daughter were handcuffed while the police arrested Parada and searched his apartment. Agent Schaefer testified that several agents participated in the arrest and search and that he did not see the women handcuffed. He also testified that Parada's son, Christian, had remained handcuffed "no more than a half hour," and that the handcuffs were removed when Christian spoke with his father in a bedroom. Christian Parada

-81-

testified about conversations between agent Schaefer and his father and threats by Schaefer to both Christian and his father to induce their cooperation. In a bill of exceptions Christian Parada testified that he remained handcuffed throughout the search of the apartment and that his mother and sister were handcuffed.

The district court did not abuse its discretion in sustaining the government's relevancy objection to exclude the testimony of Christian Parada. That Parada's wife and daughter were handcuffed does not necessarily impeach agent Schaefer's testimony that he did not see them handcuffed. Parada does not argue that the fact that Parada's family was handcuffed is relevant to whether Parada's confession was voluntary. In fact, the statement of Parada that was introduced into evidence was made seven hours later at DEA headquarters after Parada was informed of and waived his <u>Miranda</u> rights. Given the marginal relevance of the testimony that the district court excluded, the court did not err in excluding it.

8. Extraneous Offense Evidence Against Gage

Gage argues that the district court abused its discretion in admitting evidence of extraneous offenses under Fed. R. Evid. 404(b). The government was allowed to introduce evidence that on August 23, 1992, Louisiana officers stopped Kelvin Jackquet's sister for traffic violations. The Chevrolet van she was driving had been rented by Gage. While the officers were talking to her, a Chevrolet Corvette in which Gage was a passenger pulled up. Gage told the officers that he was traveling with the van. A search of the van recovered a black tote bag containing $24,985. The government also introduced the testimony of Tom Burgess that in

November of 1992 he delivered 30 kilograms of cocaine to Gage, as well as recorded telephone conversations from December of 1992 in which Gage, Burgess, and others discussed the purchase of cocaine by Gage.

Gage concedes that evidence of extraneous offenses is admissible if relevant to an issue other than the defendant's character. He also concedes that a defendant's plea of not guilty in a criminal case raises the issue of intent allowing the government to use evidence of extrinsic acts to prove the defendant's intent. He contends, however, that the district court abused its discretion in admitting this extraneous offense evidence without considering that other evidence had already been admitted to establish his intent. See United States v. Roberts, 619 F.2d 379, 383 (5th Cir. 1980) (stating that the district court "must consider 'the extent to which the defendant's unlawful intent is established by other evidence'" (quoting United States v. Beechum, 582 F.2d 898, 914 (5th Cir. 1978) (en banc))). In this case the district court did just that. In an order entered on July 8, 1993, the court concluded that the evidence the government sought to offer was relevant to the issue of Gage's intent and that, notwithstanding Gage's "overkill" argument, such evidence would not unduly prejudice Gage. The district court also minimized the risk of undue prejudice by twice giving a detailed limiting instruction that the extraneous evidence was only to be considered to show Gage's intent. The district court carefully complied with the requirements of Beechum, and we find no error in the court's rulings.

9.    Violation of Fed. R. Evid. 615 by Hall and Cortes

On cross-examination Richard Hall testified that before he testified, his sister, Wonda Cortes, called him from jail after she had testified and the two discussed her testimony.  Hall admitted that he had talked with his sister about her testimony "[d]uring the time she was testifying" and that they discussed "some of the things that were happening to her on the witness stand," "some of the things she had said," and "some of the things the lawyers had asked her about."  Gage and Varon argue that their convictions should be reversed because the district court refused to strike the testimony of Hall and Cortes pursuant to Fed. R. Evid. 615, which provides for sequestration of witnesses during trial, and refused to allow them to explore outside the presence of the jury whether Cortes influenced Hall's testimony.

Although Cortes had been sequestered pursuant to Rule 615 at the time of her conversations with Hall, the district court has discretion to allow the testimony of a witness who violated a sequestration order, and its decision to do so is reviewed for an abuse of discretion. See United States v. Wylie, 919 F.2d 969, 976 (5th Cir. 1990).  "In evaluating whether an abuse of discretion has occurred, the focus is upon whether the witness's out-of-court conversations concerned substantive aspects of the trial and whether the court allowed the defense fully to explore the conversation during cross-examination."  Id. (citation omitted). After a lengthy conference with counsel at which defense counsel suggested various alternative remedies for the Rule 615 violation, the district court concluded that defense counsel could cross-

-84-

examine Hall further about his conversations with Cortes.  The court refused, however, to allow defense counsel to question Hall or Cortes outside of the presence of the jury to explore the nature

and extent of their conversations.[18]  Defense counsel then declined to cross-examine Hall further about his conversations with Cortes. On redirect Hall testified that Cortes had not attempted to influence his testimony by telling him what to say in court.  On recross Hall essentially reiterated his cross-examination testimony quoted above.[19]

In the limited cross-examination of Hall conducted by the defense there was no indication that his testimony was "tainted" as Varon suggests.  Moreover, as in Wylie, Varon and Gage fail to identify which portions of Hall's testimony they contend "were either tailored or less than candid."  Id. at 976.  Because the defendants were allowed a full opportunity to cross-examine Hall, and because the testimony that was elicited from Hall did not indicate that his testimony was influenced by his conversations

_____

[18]The district court had the discretion under Fed. R. Evid. 104(c) to allow defense counsel to question Hall and Cortes outside of the presence of the jury or to require that the questioning be in open court before the jury.  The Advisory Committee Notes to Rule 104(c) explain that allowing counsel to question witnesses on preliminary matters outside of the presence of the jury is time consuming and in many cases testimony given in such a hearing must later be presented to the jury.

[19]Gage also faults the district court for not instructing the jury about how to consider and evaluate Hall's testimony in light of the violation of Rule 615.  In his brief Gage does not state that any defense counsel ever requested such an instruction, however, and we did not find such a request in our review of the record.

-85-

with Cortes, the district court did not err in refusing to strike the testimony of Hall and Cortes or to allow further questioning of Hall and Cortes outside of the presence of the jury.

## D.    Instructions to the Jury

### 1.    Voir Dire Instruction About Guilty Pleas

During voir dire Watson's counsel told the jury panel that a guilty plea was not evidence of a crime.  The next morning, outside of the presence of the jury panel, the government objected that the statement was misleading.  The district court agreed and instructed the jury panel:

> Yesterday, also, Mr. DeGeurin mentioned that it is possible for an individual to plead guilty to a crime and that person not actually been guilty, and that's true, that is the law, but I want you to know that it is not the policy nor the practice of this court to accept a plea of guilty from anyone who tells me he or she is not guilty of the crime to which he is pleading guilty.

During the trial the government elicited testimony from Wonda Cortes that she had pled guilty before Judge Harmon.  Defendants objected and moved for a mistrial.  Although the court denied the motion for mistrial, the court promptly instructed the jury:

> Ladies and Gentlemen, the last questions and answer are stricken and you are instructed to disregard it.  To whom Ms. Cortes pled guilty in this case is totally irrelevant to this case and you are instructed to disregard the last statement of the witness.

In the jury charge the court instructed the jury that "[t]he fact that the alleged accomplice has entered a plea of guilty to the offense charged is not evidence, in and of itself, of the guilt of any other person."  (Court's Instructions to the Jury at page 12)

Parada and Mena argue that the court's initial instruction and the government's subsequent questions to Wonda Cortes prejudiced them by implying to the jury that since Cortes had pled guilty, the district judge who was presiding over the case must have found that a conspiracy existed before accepting Cortes's plea. A district court has broad discretion under Fed. R. Crim. P. 24 in conducting the voir dire examination of the jury panel, and "absent an abuse of discretion and a showing that the rights of the accused have been prejudiced thereby, the scope and content of voir dire will not be disturbed on appeal." United States v. Black, 685 F.2d 132, 134 (5th Cir. 1982). In light of the comment to the jury panel by counsel for Watson, the court's initial instruction was proper to cure any misimpression by the jury panel that the court would allow innocent people to plead guilty. Any prejudice to Parada or Mena that resulted from the instruction or from the government's subsequent question to Cortes was cured by the district court's later instructions.

2.  Failure to Submit Duress Instruction

Watson argues that the district court erred in refusing to instruct the jury on her duress defense and erred in refusing to allow counsel to argue during closing arguments that evidence of duress negated the government's proof of Watson's intent. Watson's brother, Christopher Smith, testified that he visited his mother's house, where Watson lived, once or twice a week. Smith testified that after Watson's boyfriend, Tony Jones, was murdered in 1991, Watson was afraid to stay at home by herself and was afraid that

other family members might be killed.  Wonda Cortes testified that the conspiracy would not allow members who threatened its existence to withdraw voluntarily.  Watson argues that this evidence established that her participation in the conspiracy was compelled by her fear for her own and her family's safety.

Duress, like the related, and often overlapping, defenses of self-defense and necessity, is a form of the affirmative defense of justification.  See United States v. Harper, 802 F.2d 115, 117 (5th Cir. 1986).[20]  To raise an issue of duress for the jury a defendant must present proof of four elements:

> (1)  that the defendant was under an unlawful and "present, imminent, and impending [threat] of such a nature as to induce a well-grounded apprehension of death or serious bodily injury";
>
> (2)  that defendant had not "recklessly or negligently placed himself in a situation in which it was probable that he would be [forced to choose the criminal conduct]";
>
> (3)  that defendant had no "reasonable legal alternative to violating the law; a chance both to refuse to do the criminal act and also to avoid the threatened harm"; and
>
> (4)  "that a direct causal relationship may be reasonably anticipated between the [criminal] action taken and the avoidance of the [threatened] harm."

---

[20]"While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils." United States v. Bailey, 444 U.S. 394, 409-410, 100 S. Ct. 624, 634 (1980).

<u>Harper</u>, 802 F.2d at 117 (quoting <u>United States v. Gant</u>, 691 F.2d 1159, 1162-63 (5th Cir. 1982) (citations and footnotes omitted) (brackets in original)).

Because duress is an affirmative defense, a defendant must present evidence of each of the elements of the defense before it may be presented to the jury. <u>See</u> <u>United States v. Bailey</u>, 444 U.S. 394, 415, 110 S. Ct. 624, 637 (1980); <u>Gant</u>, 691 F.2d at 1165. In determining whether a defendant has made a threshold showing of the elements of the defense a court must objectively evaluate the facts presented by the defendant. <u>See</u> <u>Gant</u>, 691 F.2d at 1163. An objective analysis of Watson's evidence persuades us that Watson failed to present evidence that she was under a "present, imminent, and impending" threat of death or serious bodily injury, or that she had no available legal alternatives other than her continued course of criminal conduct.

Watson presented no specific evidence of any threat to her or her family. She attempts to overcome this evidentiary deficit by arguing that <u>Bailey</u> only requires an "imminent" threat. Watson argues that "'imminent' does not always mean 'immediate,'" and that in a conspiracy case like this one "a threat remains 'present, imminent, and impending' . . . as long as the conspiracy's potential for violence remains." (Watson's brief at pages 29 and 30) Watson's attempt to drive a semantic wedge between "imminent" and "immediate" is of no avail under the facts of this case. Regardless of which adjective is used to describe the threat, our decisions make it clear that the defense only arises if there is a

real emergency leaving no time to pursue any legal alternative. In stating why the defense requires proof "of absolute and uncontrollable necessity" the Supreme Court explained that "[a]ny rule less stringent than this would open the door to all sorts of fraud." The Diana, 74 U.S. (7 Wall.) 354, 360-61, 19 L. Ed. 165 (1868).[21]

Nor has Watson presented evidence of the absence of a legal alternative to drug dealing. To establish the absence of a legal alternative a defendant must show "that he had actually tried the alternative or had no time to try it, or that a history of futile attempts revealed the illusionary benefit of the alternative." Harper, 802 F.2d at 118 (quoting Gant, 691 F.2d at 1164). In assessing whether reasonable alternatives were available to a defendant a court must objectively evaluate the facts. A "[d]efendant's subjective belief as to available legal alternatives is not determinative. As long as defendant's crises permitted 'a selection from among several solutions, some of which did not involve criminal acts,' . . . the necessity defense must fail." United States v. Meraz-Valeta, 26 F.3d 992, 995 (10th Cir. 1994). As the Supreme Court explained in Bailey, "[v]ague and necessarily self-serving statements of defendants or witnesses as to future good intentions or ambiguous conduct simply do not support a

---

[21]Examples of the type of immediacy that will warrant a justification defense include a prisoner who flees a burning prison without permission to avoid being burned to death, see United States v. Kirby, 74 U.S. (7 Wall.) 482, 487, 19 L. Ed. 278 (1869), and a mariner who jettisons wood from a sinking ship during a storm without paying excise taxes to save the lives of passengers. See Reniger v. Fogossa, 1 Plowd.1, 75 Eng. Rep. 1 (K.B. 1551).

finding of this element of the defense." Bailey, 444 U.S. at 415, 100 S. Ct. at 637.

A comparison of decisions in which a duress defense has been invoked illustrates the rigorousness of the requirements of a real,

imminent threat and the absence of any legal alternative. For example, in one of the few cases in which the defense was held to be available, United States v. Panter, 688 F.2d 268 (5th Cir. 1982), Panter, a convicted felon, was working as a bartender. He was assaulted by a patron who had been drinking heavily and who had previously been convicted of murder. After a brief argument the patron threatened to kill Panter, pulled a knife, and stabbed Panter in the stomach. As the two men fought on the floor, Panter reached under the bar for a club he kept there. As he reached for the club, his hand fell upon a pistol placed there by another employee, and he shot his attacker. This court held that the defenses of self-defense and necessity were available to Panter in defending against a charge of possession of a firearm by a felon because there was no time for Panter to take any lawful action to avoid being killed. See id. at 271.

Contrasted with Panter are the facts in Harper and United States v. Harvey, 897 F.2d 1300 (5th Cir. 1990), overruled in part on other grounds by United States v. Lambert, 984 F.2d 658 (5th Cir. 1993) (en banc). In Harper the defendant, also a convicted felon, had purchased firearms to protect himself and his fiancee after he had been robbed several times. We held that the defense of necessity was not available because there was no evidence that

-91-

Harper was in danger of any "imminent" bodily harm when he purchased and possessed the gun, and because Harper had reasonable legal alternatives available to possessing a firearm; for example, he could have notified the police of the threats. See id. at 118. In Harvey the defendant, again a convicted felon, argued that he feared for his life because a rival church faction in his small hometown had engaged in "shootouts" and that Harvey had been threatened by members of the faction who wanted him to leave town. We affirmed the district's refusal to submit a duress instruction to the jury because Harvey's evidence did not show that any present, immediate threat prevented him from calling the police. See Harvey, 897 F.2d at 1305.

Watson's evidence of duress was much more analogous to Harper and Harvey than to Panter. Watson presented no evidence of any imminent threat or that she could not pursue legal alternatives to drug dealing, such as contacting the police. The generalized testimony of her brother that Watson was afraid to stay at home and that she feared for her family's safety and Cortes's testimony that the conspiracy did not allow members to withdraw fell far short of the proof required to raise an issue of duress. A district court's refusal to submit a requested jury instruction is reviewed for abuse of discretion. See United States v. Clements, 73 F.3d 1330, 1338 (5th Cir. 1996). The district court was well within its discretion in refusing to instruct the jury on the defense of duress.

During closing arguments Watson's counsel argued, based on the same evidence that Watson relied on in support of her duress

-92-

defense, that the government had failed to prove that Watson acted willfully.  The government objected that Watson's counsel was attempting to argue indirectly the duress defense.  At the government's request the district court instructed the jury that "Ms. Watson is not entitled to the defense of duress in this case."

Watson argues on appeal that this instruction left the jury with the impression that the evidence of the murders and other violence could not be considered, even in relation to her intent.

Evaluating a challenged jury instruction "requires careful attention to the words actually spoken to the jury . . ., for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." Francis v. Franklin, 471 U.S. 307, 314, 105 S. Ct. 1965, 1971 (1985) (citation omitted).  The district court's instruction to the jury was a correct and limited statement of the court's conclusion that she was not entitled to a duress defense.  It said no more, and did not foreclose Watson from arguing that the government had not proved her intent beyond a reasonable doubt.

Neither Watson's complaint that the district court failed to instruct the jury on her duress defense nor her complaint that the district court instructed the jury that she was not entitled to a duress defense provides a basis for overturning her convictions.

3.    Deliberate Ignorance Instruction

-93-

Parada challenges the district court's submission of a deliberate ignorance instruction.[22] A deliberate ignorance instruction is warranted "when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference." Moser, 123 F.3d at 825 (quoting United States v. McKinney, 53 F.3d 664, 676-77 (5th Cir. 1995)). The instruction should not be submitted unless the evidence raises inferences that

    (1)   the defendant was subjectively aware of a high probability of the existence of illegal conduct, and

    (2)   the defendant purposely contrived to avoid learning of the illegal conduct.

United States v. Lara-Velasquez, 919 F.2d 946, 951 (5th Cir. 1990).

Although Parada concedes that "the evidence . . . tended to show that Parada should have been aware of the illegal conduct . . . ." (Parada's brief at 24), he argues that there was no evidence that he purposely contrived to avoid learning of the illegal conduct. We are not persuaded by this argument. As discussed in Part I.D.1., supra, Parada rented apartments for Harold Cortes and Hernan Moreno under false names, and allowed Cortes and Moreno to use his address to register pagers and vehicles for Cortes and

_____

[22]The district court instructed the jury:

You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact. (Court's Instructions to the Jury at pages 20 and 21)

Moreno. When Parada was stopped in Louisiana for a traffic violation a Louisiana state patrolman uncovered a hidden compartment that had been built into the back of the rear seat and operated by a sophisticated hidden release device wired through the air conditioning vent. Parada told agent Schaefer that he knew Cortes and Moreno were "up to no good" when Moreno had stopped him from going into a room saying "you don't need to see what's down there." Because this evidence raised an inference that Parada purposely avoided learning the true facts about his dealings with Harold Cortes and Hernan Moreno, it supported the district court's deliberate ignorance instruction.

## E. Contact with a Juror

Murga and Parada argue that the district court abused its discretion by failing to grant a mistrial because of contact between Mona Smith Watson's brother and a juror. During a break in closing arguments Watson's brother, Christopher Smith, approached one of the jurors, handed her a business card with his phone number, and told her not to tell anyone. The juror took the card into the jury room, placed it on the table, and told several other jurors how she had received it.

A deputy marshal retrieved the card from the jury room and brought the matter to the district court's attention. The court promptly interviewed the juror privately in chambers. The juror stated that she had discussed the incident in the jury room, and that based on negative comments she had heard about Watson's attorney, Mike DeGeurin, through her employment at the police

department she had speculated that it was possible that the incident could "be a totally innocent thing" or it could have been instigated by DeGeurin. The district court instructed the juror not to say anything more about the matter and then discussed with counsel the interview with the juror. DeGeurin asked the court to instruct the jury that he did not have anything to do with the incident and that it was an innocent act that should not have been done. DeGeurin and counsel for Murga also moved to dismiss the juror who received the card, but counsel for defendant Roy Ford objected, viewing the juror as favorable to his client. Counsel for Murga moved for a mistrial.

The district court denied the motions to dismiss the juror and for mistrial. Before DeGeurin's closing argument the court again called the juror into chambers and told her "I wanted to tell you that I have done an investigation of this whole incident and I am convinced that Mr. DeGuerin [sic] had nothing whatsoever to do with it. So I just wanted you to put that out of your mind . . . ." The juror responded "[f]ine . . . I felt like it was an innocent thing on the guy, I felt like it was really innocent. But once I brought it back [into the jury room] and threw it on the table and told them where I had gotten it from, . . . it seemed to escalate from that . . . ." The court then related the second private discussion with the juror to all counsel. Murga renewed her motion for mistrial, and the court again denied it.

The court then instructed the jury:

Ladies and Gentlemen, yesterday I was informed that one of the spectators handed to one of you a business

-96-

card, and the juror to whom the business card was handed told the rest of you about it in the jury room and that there was some discussion about it, and I understand that some of that discussion was as to whether or not Mr. DeGeurin had had anything to do with the spectator handing the juror the card. I want to assure you that I have spoken to Mr. DeGeurin and made an investigation of this incident and I am convinced that Mr. DeGeurin did not have anything whatsoever to do with that. And I want you all to simply put that out of your minds and not to consider or think about that incident whatsoever during your consideration of the case.

After jury arguments were concluded the court conducted a hearing. The court inquired of each juror what he or she had heard about the card incident, whether they were concerned about it, whether they believed DeGeurin was involved, and whether the incident could affect their ability to be a fair and impartial juror. Not all of the jurors heard the discussion of the card in the jury room or any mention of DeGeurin's name. Each juror told the court that the incident would not affect his or her deliberations. The court then again denied the defendants' motions for mistrial after concluding that none of the jurors "had been influenced in any way by the card incident."

In Smith v. Phillips, 455 U.S. 209, 215, 102 S. Ct. 940, 945 (1982), the Court held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Drawing on its previous decision in Remmer v. United States, 347 U.S. 227, 74 S. Ct. 450 (1954), the Court explained in Smith that the trial judge is "to 'determine the circumstances, the impact thereof upon the jurors, and whether or not [they were] prejudicial, in a hearing with all interested parties permitted to participate.'" Smith, 455 U.S. at 216, 102

-97-

S. Ct. 945 (quoting Remmer, 347 U.S. at 230, 74 S. Ct. 451) (emphasis in Smith).  This is exactly what the district judge did in this case.

A district court has broad discretion in handling allegations of outside influences on the jury.  See United States v. Ramos, 71 F.3d 1150, 1153 (5th Cir. 1995), cert. denied, 517 U.S. 1227, 116 S. Ct. 1864 (1996) ("We do not understand Smith to require a full-blown evidentiary hearing in every instance in which an outside influence is brought to bear on a petit juror.  Our precedents allow the trial judge the flexibility, within broadly defined parameters, to handle such situations in the least destructive manner.").  Neither Murga nor Parada has shown any abuse of discretion by the district court in handling this incident.

**F.  Ineffective Assistance of Counsel**

After the jury's verdict Louis Suarez, counsel for Luis Rios-Castano, was indicted for drug dealing.  The court appointed a new lawyer to represent Rios-Castano at his sentencing and on appeal.  Rios-Castano's new counsel filed a motion for new trial alleging that Suarez had provided ineffective representation at trial because (1) he entered into a cocaine transaction with an undercover agent during trial (and later pleaded guilty to the offense), and (2) he did not devote adequate time to Rios-Castano's defense, and in particular, failed to interview a key witness.  To preserve Suarez's testimony while his memory was fresh the district court allowed the parties to make a record concerning Rios-Castano's claims.  Because Rios-Castano's newly appointed counsel

did not have access to a transcript of the trial at the time of the hearing or to all of the facts, including several government memoranda that were filed under seal, the court recessed the hearing so that Rios-Castano's new counsel could supplement the evidence at a later hearing. Nothing in the record indicates that Rios-Castano ever asked the district court to complete the hearing, and the district court has never ruled on Rios-Castano's motion for new trial.

Generally, a claim of ineffective assistance of counsel will not be addressed on direct appeal unless it has first been considered by the district court. See United States v. Bounds, 943 F.2d 541, 544 (5th Cir. 1991). Because Rios-Castano's claims of ineffective assistance of counsel focus on his trial counsel's trial strategy and investigation, which are fact-intensive issues that must initially be addressed by the district court, we dismiss this portion of his appeal without prejudice to his right to raise the issue of ineffective assistance of counsel in a proceeding brought in the district court under 28 U.S.C. § 2255.

## G.    Sentencing Issues

Esnoraldo Posada-Rios, Carlos Mena, Elisa Murga, Carmenza Varon, Raul Gamboa, Luis Rios-Castano, Anthony Gage, and Kelvin Jackquet challenge the sentences imposed by the district court. We review factual findings under the "clearly erroneous" standard mandated by 18 U.S.C. § 3742(e) and accord great deference to the trial judge's application of the sentencing guidelines to the

facts. See United States v. Humphrey, 7 F.3d 1186, 1189 (5th Cir. 1993). In a conspiracy case the drug quantity for purposes of sentencing includes amounts attributable to co-conspirator conduct in furtherance of the conspiracy as long as those amounts were reasonably foreseeable to the defendant and includes drugs possessed by other conspirators who were "aided and abetted" by the defendant. See United States v. Carreon, 11 F.3d 1225, 1237 (5th Cir. 1994). The district court's determination of the amount of drugs attributable to a defendant is a finding of fact reviewed for clear error. See United States v. Alix, 86 F.3d 429 (5th Cir. 1996). The district court's determination of a defendant's role in the offense is also a finding of fact that is reviewed for clear error. See United States v. Zuniga, 18 F.3d 1254, 1261 (5th Cir. 1994). The sentencing court may consider any relevant information, without regard to its admissibility, as long as the court concludes that it has sufficient indicia of reliability. See Section 6A1.3(a) of the United States Sentencing Commission Guidelines Manual (1993) (USSG).

1. Esnoraldo Posada-Rios

Posada-Rios argues that the district court erred by sentencing him as a Career Criminal Offender under USSG § 4B1.1 because the two prior convictions relied on by the court to sentence him as a career offender were related to his current convictions and therefore could not serve as a basis for enhancement. This argument is irrelevant because the district court did not sentence Posada-Rios as a career offender.

-100-

In Posada-Rios' Presentence Investigation Report (PSR) the probation officer calculated Posada-Rios' base offense level as 40 based on the quantity of drugs attributable to him. That level was increased by 2 levels because Posada-Rios possessed a firearm in connection with his drug trafficking activities and by an additional 3 levels for his role as a supervisor or manager in the offense. The resulting total offense level of 45 was then reduced to 43, the maximum offense level under the Sentencing Guidelines. Because Posada-Rios' offense level under the career criminal provisions of Chapter Four of the guidelines was lower (37), it did not apply. With a total offense level of 43 and a criminal history category of VI, Posada-Rios' guideline sentence was life in prison, the sentence that the district court imposed. There was no error in Posada-Rios' sentence.

2. Mena

The probation officer calculated Mena's base offense level on counts 1, 3, 42, and 43 under USSG § 2D1.1 as 36, based on the cocaine he negotiated to deliver to Wonda Cortes in 1991 and the cocaine seized from the Nissan on August 11, 1992. For Mena's conviction on count 46, illegal reentry in violation of 8 U.S.C. § 1326(a), the probation officer calculated a base offense level of 8 under USSG § 2L1.2(a), which was increased by 16 levels under USSG § 2L1.2(b)(2) because Mena had previously been deported after being convicted for an aggravated felony, for an adjusted offense level of 24. Under the grouping rules of USSG § 3D1.4 his multiple-count adjustments calculated to only one unit, and his

guideline level became the greater adjusted offense level of 36. Mena was assigned to criminal history category II. The district court adopted the PSR and found that Mena's imprisonment range under the sentencing guidelines was 210-262 months. The court concluded, however, that Mena was subject to the statutory minimum sentence of 240 months under 21 U.S.C. § 841(b)(1) for counts 1, 3, 42, and 43 based on his prior Texas drug conviction and that the statutory maximum sentence on count 46 was then 180 months in prison. The court sentenced Mena to concurrent sentences of 240 months in prison on counts 1, 3, 42, and 43 and a concurrent 180-month sentence on count 46.

On appeal Mena does not challenge the manner in which the probation officer and the district court grouped his counts of conviction or that his prior state conviction constitutes a prior conviction that requires a mandatory minimum sentence of 240 months. Instead, he argues that the district court erred in considering the cocaine that he negotiated but never delivered to Wonda Cortes, and that the district court erred in calculating his sentence on count 46.

Because the district court sentenced Mena to the statutory minimum based on his prior state drug conviction, the total amount of cocaine attributable to Mena does not affect his guideline calculation or his sentence on the conspiracy and controlled substance violations. Because Mena's guideline range on count 46 was based in part, under the grouping rules, on the amount of

cocaine attributed to him, the amount of cocaine did, however, indirectly affect his guideline range on count 46.

A district court may hold a defendant accountable for an unconsummated transaction unless the defendant did not intend and was not reasonably capable of producing this amount. See USSG § 2D1.1, comment 12 ("In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount."); United States v. Davis, 76 F.3d 82, 85 (5th Cir. 1996). There was no evidence that Mena did not intend or could not produce the cocaine to Wonda Cortes; their negotiations apparently floundered over price.[23] Accordingly, Mena has not shown any error by the district court in including the cocaine that Mena negotiated to sell to Cortes in calculating his base offense level under § 2D1.1.

Mena's second sentencing challenge is unclear. Under the multiple-count grouping rules Mena's guideline range on count 46 was 210-262 months. Because the statutory maximum under 8 U.S.C. § 1326(b)(2) on count 46 was 180 months at the time of Mena's conviction, the district court sentenced Mena to a concurrent sentence of 180 months on that count. Mena cites no authority, and

_____

[23]In his brief Mena argues that the evidence only showed that Cortes spoke with Mena about a possible purchase of 30 to 40 kilograms of cocaine, not the 50 kilograms referenced in Mena's PSR. Although there was also evidence in the record of a discussion of 50 kilograms, even if Mena were correct on this factual argument it would merely lower his base offense level by two levels, which would not affect his sentence on any of his counts of conviction.

presents no argument, why this sentence was not correct. He makes only the conclusory argument that his "[b]ase [l]evel should have been 8 plus 16, or 24, before the application of a 2-level decrease for acceptance of responsibility." (Mena's brief at page 19) Because this argument overlooks the effect of the grouping rules to his sentence on count 46, we reject it and conclude that his 180-month sentence on count 46 was proper.

### 3. Murga

The probation officer calculated a base offense level of 38 for Murga's sentence on counts 1, 3, and 41 based on 162.2 kilograms of cocaine. That level was increased by 2 levels under USSG § 3B1.1(c) for her role as an organizer, manager, leader, or supervisor, resulting in an adjusted offense level of 40. For Murga's sentence on count 48, making a false statement on an application for immigrant visa in violation of 18 U.S.C. § 1546(a), the probation officer calculated a base offense level of 6 under § 2L2.2(a), increased 2 levels under USSG § 2L2.2(b)(1) because she had previously been deported. Under the grouping rules of USSG § 3D1.4 her multiple-count adjustments were calculated to only one unit, and her guideline level became the greater adjusted offense level of 40. With a criminal history category of I, her guideline range was 292-365 months in prison.[24] The district court adopted the PSR.

---

[24]A statutory maximum sentence of 60 months applied to count 48.

-104-

Murga first argues that the district court erred by holding her accountable for 162.2 kilograms of cocaine.  She argues that the amount attributable to her is less than 125 kilograms, and alternatively, not more than 148.9 kilograms.  Although Murga argues that the evidence relied on by the probation officer was uncertain and not credible,[25] she does not explain how she arrives at her alternative drug quantity calculations.  The district court rejected a similar argument at Murga's sentencing.  Our review of the record satisfies us that there was ample evidence to support the amount of cocaine that the probation officer and the district court attributed to Murga.

Murga also complains that the district court erroneously increased her base offense level by 2 levels under § 3B1.1(c) for her role in the offense.  At Murga's sentencing the district court rejected this argument citing several instances in which Murga had recruited other people to distribute cocaine for her.  We also reject this argument, which is essentially a disagreement with the district court as to how her criminal activities should be characterized.  There was sufficient evidence for the district court to conclude that Murga occupied a supervisory or management role in the conspiracy.

Murga argues that the weapon found at her home at the time of her arrest provides no basis for departure under USSG § 5K2.6.

---

[25]To the extent that Murga contends that the probation officer could not rely on FBI debriefings of confidential informants, she is incorrect.  See United States v. Golden, 17 F.3d 735, 736 (5th Cir. 1994).

This argument is frivolous because the probation officer did not recommend an upward departure or any adjustment to Murga's guideline range based on the weapon, and there was no mention of it at the sentencing hearing. In fact, the district court sentenced Murga to 292 months in prison, the lowest sentence possible under the sentencing guidelines. We have considered Murga's numerous other objections to her sentence, including her conclusory challenges to the 60-month concurrent sentence she received on count 48, and conclude that none have merit.

4.   Varon

Varon was sentenced on September 2, 1994, under the 1993 edition of the Sentencing Guidelines. The probation officer and the district court applied a base offense level of 40 under USSG § 2D1.1, after attributing 608.4 kilograms of cocaine to Varon. Varon received no enhancements and had a criminal history category of I. This resulted in a guideline range of 292-365 months. The district court sentenced Varon to 292 months in prison.

Varon's only sentencing argument on appeal is that she is entitled to be resentenced under Amendment 505 to the Sentencing Guidelines, effective November 1, 1994. Under that amendment Varon's base offense level would be 38 instead of 40. As Varon correctly states, this amendment is given retroactive effect under USSG § 1B1.10(c). See United States v. Gonzalez-Balderas, 105 F.3d 981 (5th Cir. 1997). Whether to reduce a sentence based on a subsequent change in the sentencing guidelines rests with the sound

discretion of the district court and the proper mechanism for reviewing such a claim is a motion brought under 18 U.S.C. § 3582(c)(2). See Gonzalez-Balderas, 105 F.3d at 982. We therefore dismiss this portion of Varon's appeal without prejudice to her right to seek relief from the district court.

### 5. Gamboa

Gamboa argues that the district court misapplied the sentencing guidelines by refusing to reduce his offense level under USSG § 3B1.2 for minimal or minor participation. Gamboa's request is premised on his argument that he is less culpable than Mena. A defendant is not entitled to a reduction under § 3B1.2, however, merely because he was less culpable than his codefendants; a downward adjustment may only be appropriate if the defendant was "substantially less culpable than the average participant." United States v. Zuniga, 18 F.3d 1254, 1261 (5th Cir. 1994). Gamboa bears the burden of proving his mitigating role by a preponderance of the evidence. Id. Because Gamboa has not established that his conduct in the August 11, 1992, drug deal for which he was convicted on counts 42 and 43 was substantially less culpable than Mena's, the district court did not abuse its discretion in denying him a mitigating role adjustment.

### 6. Rios-Castano

Rios-Castano was convicted of counts 1 and 2, the RICO conspiracy and substantive offenses. Under USSG § 2E1.1(a)(2) the base offense level for racketeering is calculated based on the

offense level applicable to the underlying racketeering activity. Where, as here, there is more than one underlying racketeering act, each racketeering act is treated as if it were contained in a separate count of conviction. USSG § 2E1.1, comment 1. The racketeering act that yields the greatest offense level is used to determine the guideline range. Id. In this case the greater base offense level was 43 for the murder of Carolyn Tippett.

On appeal Rios-Castano argues that the district court erred in calculating his sentence based on the murder of Carolyn Tippett because it was not a foreseeable consequence of his criminal activity as required by USSG § 1B1.3(a)(1)(B) but was merely the result of a personal dispute between Tippett and Edison Alvarez. Rios-Castano made the same argument at sentencing before the district court. The district court chose to credit the PSR's conclusion, based on a police report of the Tippett killing, that her death occurred when Palomino, seeing that he had walked into a trap in the parking lot of the Miami Beat Disco, grabbed Tippett and used her as a human shield to protect himself from a fusillade of bullets from Samuel Posada-Rios' men who were waiting for him in the parking lot. The police report noted that Tippett's autopsy reflected that she had sustained 14 bullet wounds. The district court concluded that Rios-Castano could have reasonably foreseen Tippett's murder because he and other conspirators had gone to the club to eliminate Palomino, a rival drug dealer. Because the police report bore sufficient indicia of reliability, the probation officer and the district court properly relied on it. Reviewing

-108-

the district court's finding of Rios-Castano's responsibility for Tippett's killing under a clear error standard, we conclude that the court could properly choose to discredit the self-serving testimony of Rios-Castano and credit instead the police report and the previously announced intention of Rios-Castano and other members of La Compania to go to the club to kill Palomino. Based on that information, it was reasonable to conclude that Rios-Castano could have foreseen that an innocent bystander could be injured in an attempt to murder Palomino.

Rios-Castano also argues that the district court erred in calculating his criminal history category. An offense level of 43 carries a mandatory life sentence irrespective of the defendant's criminal history category, and the transcript of Rios-Castano's sentencing makes it clear that the district court would not have considered any grounds for any downward departure from the guideline sentence. Any error committed by the district court in calculating his criminal history category was therefore harmless. See United States v. Rogers, 126 F.3d 655, 661 (5th Cir. 1997).

7. Gage

Gage argues that the district court misapplied the guidelines by increasing his offense level by 2 levels for his participation as an organizer, leader, manager, or supervisor pursuant to USSG § 3B1.1(c). At Gage's sentencing the district court expressly found that Gage was responsible for recruiting and directing Charles White in his drug trafficking activities. Because the evidence discussed in Part I.F., supra, supports that conclusion,

-109-

the district court did not err in increasing Gage's base offense level under § 3B1.1(c).  See United States v. Palomo, 998 F.2d 253, 257 (5th Cir. 1993).

8.   Jackquet

In determining Jackquet's base offense level for counts 1, 2, 3, and 27 the probation officer concluded that Jackquet was accountable for 43 kilograms of cocaine and calculated a base offense level of 34 under USSG § 2D1.1 (applicable to at least 15 kilograms of cocaine but less than 50 kilograms of cocaine).  The district court adopted the PSR.  On appeal Jackquet argues that the court erred in the amount of drugs attributed to him.  Specifically, Jackquet argues that he should only be held accountable for 12 kilograms of cocaine that Wonda Cortes testified she delivered to him.  He argues that the cocaine attributed to him in Wonda Cortes's drug ledgers "double counts" the cocaine she testified about at trial and that he did not reasonably foresee the drug purchases of the other conspirators that occurred in his presence.

We are not persuaded by this argument.  Our brief summary of the facts in Part I.D.2.e. and f., supra, reflects direct sales of 18 kilograms of cocaine to Jackquet by Wonda Cortes (2 kilograms on November 15, 1991; 7 kilograms on November 16, 1991; 4 kilograms on December 10, 1991; 1 kilogram on December 11, 1991; and 4 kilograms in January of 1992).  Cortes delivered another 45 kilograms of cocaine to Jackquet's brother, Anthony Jerome Gage, at Jackquet's apartment in August of 1991 (see Part I.D.2.c., supra).  This

-110-

cocaine was attributable to Jackquet both as an aider and abettor pursuant to USSG § 1B1.3(a)(1)(A) and because it was reasonably foreseeable to Jackquet that other drug dealers with whom he conspired would deal in additional amounts of cocaine.  The district court did not err in using 34 kilograms to calculate Jackquet's base offense level on these counts.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, we **VACATE** Mena's conviction and sentence on count 1.  In all other respects we **AFFIRM** the district court's judgments of conviction and sentences.